## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Civil Action No. 90-229E** |
| | ) | |
| **v.** | ) | **District Judge Susan Paradise Baxter** |
| | ) | |
| **ROBERT BRACE, et al.,** | ) | |
| | ) | |
| **Defendants.** | ) | |

### MEMORANDUM OPINION[1]

### I.      INTRODUCTION

This litigation has its genesis in a 1990 enforcement action that the United States of America ("United States" or "Government") brought against Defendants Robert Brace and Robert Brace Farms, Inc. (collectively "Brace" or "Defendants") for violations of Section 404 of the Clean Water Act.  The situs of the original violations is a U-shaped patch of land on Defendants' property, approximately 30 acres in area, that has been designated as protected wetlands.

After determining that Brace was liable for engaging in the unpermitted discharge of dredged or fill material into waters of the United States, the United States Court of Appeals for the Third Circuit remanded the case to the district court for a determination of civil penalties. *See United States v. Brace,* 41 F.3d 117 (3d Cir. 1994) (hereafter, "*Brace I*").  Thereafter, the parties entered into a consent decree (the "Consent Decree" or "Decree") whereby Brace agreed,

---

[1] Throughout this Memorandum Opinion, the Court's citations to filings of record will use CM/ECF pagination, as set forth in the head of the referenced document, except with respect to deposition testimony.  When citing to deposition testimony, the Court will reference the page of the deposition transcript.

among other things, to undertake certain remedial measures in order to restore the previous hydrologic conditions of the wetlands.

The Government contends that, after initially complying with the terms of the Consent Decree, Brace later reversed the remedial measures and converted a portion of the wetlands area to agricultural use, resulting not only in violations of the Consent Decree but also additional violations of the Clean Water Act.  This second phase of enforcement litigation ensued.

Presently pending before the Court are the Government's "Renewed Second Motion to Enforce Consent Decree and for Stipulated Penalties," ECF No. 285, and the Defendants' "Redrafted Motion to Vacate Consent Decree and to Deny Stipulated Penalties, pursuant to Federal Rules of Civil Procedure 60(b)(5)," ECF No. 313.[2]  For the reasons that follow, the Government's motion will be granted in part and denied in part, and the Defendants' motion will be denied.

## II.   BACKGROUND AND HISTORY

### A.   Regulatory Background

Congress enacted the Clean Water Act ("CWA"), 33 U.S.C. §1251, et seq., to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters."  *Id.* §1251(a).  To that end, "Section 301(a) of the CWA prohibits the discharge of any pollutant into navigable waters of the United States, unless the discharge is authorized by a permit."  *United*

---

[2] The Court possesses ancillary jurisdiction to address these matters. *See National City Mortg. Co. v. Stephen*, 647 F.3d 78, 85-87 (3d Cir. 2011) ("Ancillary enforcement jurisdiction ... give[s] federal courts the power to enforce their judgments ...."); *Shell's Disposal & Recycling, Inc. v. City of Lancaster*, 504 F. App'x 194, 198 (3d Cir. Nov. 16, 2012) (district court retains jurisdiction over agreement embodied in court order based on "its inherent authority to manage its proceedings, vindicate its authority, and effectuate its decrees") (citation omitted); *Dickler v. Cigna Pro. & Cas. Co.*, 48 F. App'x 856, 858 (3d Cir. Oct. 4, 2002) ("[T]he district courts have inherent power to modify and enforce compliance with properly entered consent decrees.").

*States v. Brace*, 41 F.3d at 122 (citing 33 U.S.C. §§1311(a), 1362(12) (1988)).  The term "pollutants" is statutorily defined to include fill material such as "dredged spoil, . . . rock, sand, [and] cellar dirt."  Id. ¶1362(6).  "Navigable waters" is broadly defined as "the waters of the United States." *Id*. §1362(7).  By administrative regulation, "waters of the United States" has been further defined to include "wetlands."  *See* 33 C.F.R. §328.3(a); 40 C.F.R. §230.3(s).

Section 404 of the CWA authorizes the Secretary of the Army, through the Army Corps of Engineers (the "Corps"), to issue permits "for the discharge of dredged or fill material into the navigable waters at specified disposal sites." 33 U.S.C. §1344(a).  Under Section 309(b) of the CWA, the EPA is authorized to bring civil enforcement actions to enjoin Section 301 violations. 33 U.S.C. §1319(b).

B.  Factual and Procedural History

Defendant Robert Brace Farms, Inc. is a Pennsylvania corporation engaged principally in the farming business.  Defendant Robert Brace is president of Robert Brace Farms, Inc. and the owner of several contiguous parcels of real property located in Erie County, Pennsylvania, including a tract of land known as the "Murphy Farm."  Within the Murphy Farm is a 30-acre area containing wetlands that are subject to the Clean Water Act.  It is this area that was the subject of Defendants' original CWA violations and that is now governed by the terms of the Consent Decree.  At issue in this litigation are Defendants' activities within that wetlands area (referred to at times hereafter as the "Consent Decree Area").

Brace acquired the subject property in 1975, when he purchased over 130 acres of real estate from his parents.  *See Brace v. United States*, 72 Fed. Cl. 337, 339-340 (2006) (hereafter, "*Brace II*"), *aff'd,* 250 F. App'x 359 (Fed. Cir. 2007).  This property lies along Greenley Road in Waterford Township and is bisected into northern and southern tracts by South Hill Road, also

known as "Lane Road."  The northern portion of land, known as "Homestead Farm," lies north of Lane Road, south of Greenlee Road, and east of Elk Creek.  The southern portion of land, known as "Murphy Farm," is situated south of Lane Road, west of Greenlee Road, and east of Sharp Road.  In 2012, Brace acquired a third contiguous parcel known as the "Marsh Farm," which lies north of Lane Road and west of Elk Creek.

The Consent Decree Area is a U-shaped portion of land, totaling approximately 30 acres, located within the Murphy Farm.  See Lutte Decl., ECF No. 226-1; Consent Decree Ex. A, ECF No. 207-2.  Within the 30-acre Consent Decree Area are four unnamed tributaries, each of which flows into Elk Creek at points located within the Site.  Lutte Decl. ¶6; *Brace II*, 72 Fed. Cl. at 341; 1993 Adjudication, ECF No. 207-3, at 2, ¶7.  Elk Creek, in turn, flows directly into Lake Erie.  Lutte Decl. ¶6; *Brace II*, 72 Fed. Cl. at 341; 1993 Adjudication, ECF No. 207-3, at 2,¶8.

Brace's family originally acquired the Homestead and Murphy Farms in the 1930s and 1940s.  *Brace II,* 72 Fed. Cl. at 340.  The soil is not naturally well suited for farming and, due to the traditional presence of beaver dams, portions of the Murphy Farm have periodically been inundated with water.  *Id*.  In 1961, the U.S. Department of Agriculture's Soil Conservation Service (SCS), now known as the Natural Resources Conservation Service (NRCS)  developed a "Soil and Water Conservation Plan" for Brace's father, Charles D. Brace.  *Id*.  The plan covered both the Homestead and Murphy Farms and envisioned, among other things, a system of tiles and ditches to improve drainage on certain fields in order to make them more suitable for farming.  *Id*. Charles Brace partially implemented this plan but did not complete all of the work. *Id*. at 341.  During this time, the land that is now part of the Consent Decree Area was utilized primarily as pastureland.  *Id*.

As recounted by the U.S. Court of Appeals for the Third Circuit:

Brace purchased the property from his father with the intent of continuing and improving his father's established farming operation. It was Brace's intention to integrate the various portions of the property into an overall operation for an effective and productive farming business. At the time Brace purchased the property containing the [wetlands] site from his father, the site was vegetated with areas of scrub brush, including red brush and briars.

In 1977, Brace sought the advice and assistance of the Agricultural Stabilization and Conservation Service ("ASCS") as part of his plan to develop an integrated farming operation on the property that includes the site. The ASCS is "an agency of the United States Department of Agriculture which is generally responsible for administering commodity production adjustment and certain conservation programs of the Department." 7 C.F.R. § 12.2(a)(2) (1994). Brace's father had previously worked with the ASCS to prepare a drainage plan relating to the site for the purpose of farming the entire property. At the time he purchased the property from his father, Brace obtained and utilized the soil and conservation plans that had been prepared for his father by the ASCS. The drainage system impacts the ability to produce crops on all parts of Brace's property.

The existing drainage system was in poor condition and not yet complete at the time of Brace's acquisition. Brace began cleaning the system in 1976 in order to improve upon the existing system and make it effective for agricultural development. In the following years, Brace maintained and improved the drainage system pursuant to the plan recommended by the ASCS. From 1977 to 1985 the ASCS periodically visited the site and provided technical assistance and cost-sharing arrangements to Brace.

As of 1977, the essential portions of Brace's improvements to the existing drainage system were intact and operating. Brace's work in improving upon the interconnected drainage system progressed continuously from 1977 to 1987, as time, funds and equipment were available. If the necessary funds had been available to him in 1977, Brace would have expedited his farming plans and completed the project at that time. As a result of Brace's efforts, by the end of 1979 the site was dry, with the exception of times of excessive rainfall.

Brace cleared, mulched, churned, levelled, and drained the formerly wooded and vegetated site from 1985 through 1987. In 1986 and 1987, Brace paid for excavation in the site and the burying of plastic tubing or "drainage tile" in an effort to drain the site. Throughout the 1980's, Brace used appropriate equipment to remove unconsolidated soil, pebbles, silt, and growth which were impeding water flow. Farmers in the area typically engaged in such practices.

As a result of Brace's levelling, spreading, and tiling, Brace began to grow crops on the site in 1986 and 1987. Brace did not have a permit issued pursuant to Section 404 of the CWA authorizing his activities.

The United States became aware of Brace's activities in 1987. During 1987 and 1988, the United States issued three orders to Brace, directing him, inter alia, to refrain from further disturbing the site, so that it could naturally revegetate with indigenous plant species. After the issuance of these orders, Brace continued to mow vegetation on the site. In October of 1988, Brace received an administrative complaint in connection with his farming activities on the site. Brace requested a hearing to contest the complaint, believing that his activities were exempt from any and all permit requirements. Prior to the hearing, the complaint was dismissed.

In the summer of 1988, Brace approached the ASCS in order to gain the status of "commenced conversion from wetlands" prior to December 23, 1985 with respect to the site. The ASCS was authorized to make such a determination under the Food Security Act of 1985, 16 U.S.C. §§ 3801, et seq. This Act contains a provision, referred to as the "Swampbuster," which denies certain Department of Agriculture benefits to farmers who produce an "agricultural commodity on converted wetland," unless such conversion commenced before December 23, 1985. 16 U.S.C. §§ 3821, 3822 (1988 & Supp. V 1993).

The ASCS granted the status to the site, finding that Brace's on-going farming activities had commenced prior to December of 1985, which would enable Brace to complete conversion and produce an agricultural commodity without losing USDA benefits. Letter from Erie County ASCS Office to Robert Brace (9/21/88); App. at 172. However, the ASCS expressly noted that "[t]he granting of a commencement ... request does not remove other legal requirements that may be required under State or Federal water laws." USDA Form; App. at 173.

In April 1990, as a cautionary measure, Brace approached the Army Corps of Engineers ("COE") in an effort to obtain an after-the-fact permit to conduct his farming activities on the site, despite his belief that the activities were exempt from the permit requirements of the CWA. The United States Environmental Protection Agency ("EPA") requested that the COE not review an application from Brace for an after-the-fact permit. Brace was advised that because the matter was then in litigation, the government would not act on his request for a permit.

*Brace I*, 41 F.3d at 120–21.

In October 1990, the United States filed the within civil action against Defendants, alleging that they had violated Sections 301 and 404 of the CWA by engaging in dredging, filling, leveling, and draining activities on the wetlands site, resulting in the unpermitted discharge of pollutants into waters of the United States.  Prior to trial, the parties stipulated that

the subject 30-acre area were wetlands subject to the CWA.  ECF No. 236-1; ECF No. 207-3 at 2, ¶4; ECF No. 207-3 at 17, ¶5.

The case then went to trial on the issue of whether Brace's activities on the Site were exempt from the CWA's permitting requirements.  Following a bench trial, then-presiding U.S. District Judge Glenn Mencer entered judgment for Defendants on the ground that Defendants' activities on the subject wetlands constituted:  "(a) normal farming activities; (b) upland soil and water conservation practices; and, (c) maintenance of drainage ditches." ECF No. 207-3 at 22, ¶32; see 33 U.S.C. §1344(f)(1)(A) and (C)), *see also Brace I*, 41 F.3d at 119-120 (discussing lower court ruling).

On appeal, the United States Court of Appeals for the Third Circuit reversed and directed that judgment be entered in favor of the United States.  *See Brace I, supra.*  Initially, the court determined that the United States, "either by stipulation or at trial," had established the five elements of a prima facie Section 404 violation, namely:

> (1) defendants admitted that they are "persons" within the meaning of the CWA; (2) defendants admitted that the activities at the site were conducted without a permit; (3) defendants stipulated that the site was a wetland at the time of the discharges; (4) the district court held that the site constituted waters of the United States at the time of defendants' activities; and (5) the district court held that defendants' clearing, mulching, churning, and levelling of the formerly wooded and vegetated site constituted a discharge of pollutants into the waters of the United States and that defendants paid for excavation and installation of drainage tubing in an effort to drain the site.

*Brace I,* 41 F.3d at 120.  The burden thus fell on Defendants to demonstrate that their activities (i) satisfied the requirements of a Section 404(f)(1) exemption and (ii) fell outside of the recapture provision of Section 404(f)(2); the Court ruled, however, that Defendants had not met this burden.  41 F.3d at 124-129.  Having concluded that Defendants were liable for violations of Section 404 of the CWA, the court remanded the matter for assessment of appropriate penalties.

Following the appellate court's remand, the parties entered into the Consent Decree that is the subject of the instant motions. The terms of the Decree are discussed in more detail below but, in broad brush, the Consent Decree permanently enjoined the Defendants from "discharging any pollutants (including dredged or fill material) into the approximately 30 acre wetland site, unless such discharge is in compliance with the CWA." ECF No. 207-2. The Decree also incorporated a wetlands restoration plan that required Brace to remove or disable drainage tile, fill in certain surface drainage ditches, and install a check dam over a tributary that ran through the wetlands. *Id*. Brace was further required to record the Consent Decree in the applicable land records office. *Id*.; *see also Brace II*, 72 Fed. Cl. at 344.

The parties do not dispute that Brace initially complied with the terms of the Consent Decree. To that end, he removed extensive amounts of tile and drainage tunnels from his property and thereby deconstructed portions of the system that had previously been constructed to drain certain areas of the property. He also installed the check dam, which was designed to counteract dredging that had occurred on one of the tributaries on the property. *See Brace II*, 72 Fed. Cl. at 344.

At some point in time, the water table on Plaintiff's property rose, leading Brace to contend that approximately 40 to 50 acres of the combined Murphy and Homestead Farms had become unusable. In November 1998, Brace filed a complaint in the United States Court of Federal Claims, asserting that the Government's actions relative to the Consent Decree Area effectuated a "taking" of his property under the Fifth Amendment. *See Brace II, supra*. The Court of Federal Claims ultimately concluded that the Consent Decree's restoration plan did not effectuate either a regulatory or physical taking of Plaintiff's property; it therefore entered judgment in favor of the Government on August 4, 2006. *Brace II*, 72 Fed. Cl. at 344. On

8

appeal, the United States Court of Appeals for the Federal Circuit affirmed the judgment.  *See Brace v. United States*, 250 F. App'x 359 (Fed. Cir. 2007).

      C.  <u>Events Giving Rise to the Current Enforcement Litigation</u>

        1.  COMMUNICATIONS IN 2011 AND 2012

In January 2011, Brace reached out to Jeffrey Lapp, Associate Director of the Office of Environmental Programs for Region III of the EPA, with concerns about water encroaching upon the upland portions of his farm.  ECF No. 207-8.  Explaining his need to remove water from those areas, Brace inquired about the precise boundaries of the wetlands.  *Id.*  After receiving no reply, Brace reached out again on February 16, 2011, explaining that "spring is quickly approaching and my plans for spring planting are already underway."  ECF No. 207-9.  He again requested assistance in identifying the wetlands boundary and inquired whether "there is anything that is needed from the EPA prior to going in and cleaning the ditches on my upland properties."  *Id.*  Lapp responded on March 14, 2011 that he was unable to locate "a precise metes and bounds description" of the area but was enclosing  several maps, including the one attached to the Consent Decree, to assist Brace in determining the boundary lines.  ECF No. 207-11.

In April 2011 Brace made several phone calls to Todd Lutte, a CWA Section 404 inspector for the EPA, inquiring about the boundary lines of the Consent Decree Area.  Lutte Decl., ECF No. 226-1, ¶14.  Brace expressed his desire to remove beaver dams and clean ditches in order to stop the accumulation of water on upland portions of his property.  *Id.*

The following month, Lutte visited Brace's property for the purpose of viewing beaver dams and a clogged culvert that passed underneath South Hill/ Lane Road, east of Elk Creek.  Lutte Decl. ¶15.  During the visit, Lutte provided Brace with an aerial photograph depicting a

polygon outline of the approximate Consent Decree Area.  *Id.*  After studying the photograph, Brace returned a mark-up to Lutte of where he thought the wetlands boundary should be and where he thought it would be "most logical to maintain the drainage ditches[.]"  ECF No. 214-31.

In a September 12, 2011 email to Brace, Lutte acknowledged that beaver dams on Brace's property were causing water to back up in the channel that crosses South Hill/ Lane Road and causing sediment to accumulate within the channel and clog the nearby culvert.  ECF No. 214-54.  Lutte understood that Brace wanted to remove the beaver dams and then clean the channel and the culvert, so that the accumulating water could drain properly.  *Id.*  Lutte advised Brace that he could remove the dams "provided there is no discharge of dredge or fill material to Waters of the US and [the work] is done in compliance with the directions of the PA Fish and Boat Commission and the US Army Corps of Engineers and the Erie County Conservation District."  ECF No. 214-54.  Lutte also informed Brace that, while he would not need the EPA's authorization for his intended "agricultural ditch maintenance activities," Brace should consult Mike Fodse of the Army Corps of Engineers about whether a permit from the Corps would be needed.  *Id.*

Meanwhile, on September 8, 2011, Fodse had conducted his own site visit relative to Brace's request for a determination whether he could engage in channel cleaning without a CWA permit under an exemption applicable to agricultural drainage ditch maintenance.  ECF No. 214-35.  Fodse observed multiple beaver dams on the property, and he advised Brace to request a jurisdictional determination from the Corps once the dams were removed.  *Id.; see also* ECF No. 214-36.

In a follow-up email to Brace on October 7, 2011, Fodse confirmed that removal of the beaver dams "does not require a permit from [the Corps] provided there is no discharge of dredge or fill material to Waters of the United States." ECF No. 214-36. With respect to Brace's plan to clean the channel and the culvert, Fodse noted the Corps' belief that the "Waters of the United States" identified in the Consent Decree referred only to the 30-acre wetlands area, and "not the watercourses that provide hydrology to this wetland." *Id.* "Therefore," he wrote, "once the Beaver Dams have been breached, The US Army Corps of engineers will need to conduct a Jurisdictional Determination on the channel to determine if activities (dredging) within it would require a permit under the Clean Water Act." *Id.* Depending on the outcome of the jurisdictional determination, permits might be required for the intended work. *Id.* As for the 30-acre Consent Decree Area, Fodse reminded Brace that the area "must be maintained as wetlands." *Id.*

Eighth months later, in May 2012, Brace wrote Fodse to inform him that "we have removed the beaver dams that were creating drainage problems in my farm ditches on my Waterford farm." ECF No. 207-12. He inquired as to Fodse's availability "sometime in the near future to revisit my farm to make your jurisdictional determination." *Id.*

2. THE JULY 24, 2012 SITE VISIT

These developments culminated in Fodse and Lutte conducting a joint site visit with Brace and his sons on July 24, 2012. Also present on that date were Rhonda McAtee (Brace's daughter) and Ronald Bosworth (a representative from a state senator's office). What occurred during this visit is the subject of vigorous disagreement between the parties, as set forth below.

According to Lutte, the point of the meeting was "to see the 'ditches' that Mr. Brace had asked to clear." Lutte Decl., ECF No. 226-1, ¶17. Prior to the meeting, Lutte had been under the

impression that Brace wanted to clear a particular channel to the east of Elk Creek where Lutte had observed a clogged culvert during his May 2011 visit.  But during the July 2012 meeting, Brace showed Fodse and Lutte channels in a different area of his property that he wanted to clean, including "an unnamed tributary to Elk Creek and Elk Creek itself."  *Id*.  Brace asked Lutte and Fodse if those channels could be maintained without the need for a permit, pursuant to a CWA exemption.  *Id*.  Brace claimed that these channels were not tributaries of Elk Creek but rather agricultural ditches that his grandfather had created decades before.  *Id*.  According to Lutte, Fodse told Brace that if the channels were actually agricultural ditches, then Brace might be able to maintain them without a CWA permit; however, the Corps would need to make a final determination as to whether channels could be maintained pursuant to a CWA exemption.  *Id*. Lutte also recalled "repeatedly [telling] Mr. Brace and his son, Randy Brace, that under no circumstances should work be done within that 30-acre wetland area subject to the Consent Decree."  *Id*.

Fodse testified that the purpose of the July 24, 2012 site visit was to determine, from a jurisdictional standpoint, whether certain channels that Brace wanted to clean would be subject to the CWA's permitting requirement.  Fodse Depo., ECF Nos. 236-34 and 214-56, at 85-86, 89, 93, 105.  Because Brace had described the channels as drainage "ditches," Fodse intended to assess the characteristics of the channels so he could make a proper classification.  *Id*. at 85, 89, 93.  During the site visit, Fodse and the others walked along an unnamed tributary to Elk Creek that lay within the Consent Decree Area and then followed Elk Creek north to Lane Road.  *Id*. at 95, 108.  Because he did not have a map and was working off an aerial photograph of Brace's property, Fodse did not realize at the time that he was examining areas within the Consent Decree Area.  *Id*.  at 93, 96.  During his inspection, Fodse observed a ditch that appeared to be

man-made and was full of water.  *Id*. at 109-111.  In the area where the ditch intersected with Elk

Creek, Fodse observed that the channel was "completely filled with sediment" and wetland

vegetation and lacked any water flow.  *Id*. at 112.  Because these areas were "heavily impaired"

and "weren't functioning as streams anymore," Fodse advised Brace that he could remove the

sediment and vegetation from the channels without the need for a permit, based upon an

assumption that the work would involve "maintenance for agricultural activities."  *Id*. at 147-48;

*id*. at 149, 153.

Defendants insist, however, that the authorization they received during the July 24, 2012

site visit went beyond just dredging the channels and removing vegetation and sediment.

Instead, Defendants claim, Fodse and Lutte also "expressly authorized [them] . . . 'to farm' the

areas adjacent to Elk Creek and its tributaries south of Lane Road located within the Consent

Decree Area, which [they] reasonably understood as including the planting of those areas with

crops."  ECF No. 317 at 16.  Randall Brace testified that, after declaring the channels in question

to be "agricultural ditches," Lutte and Fodse authorized the Braces to clear vegetation and

"farm" throughout the entire Consent Decree Area, with the exception of a small area located in

the south central portion.  *See* Randall Brace Depo., ECF No. 214-33, at 62, 67-68, 72, 119-122;

*see also* ECF No. 214-65 (orange area circled where Defendants allegedly were told they could

not carry out farming activities).  According to Randall, the agents advised that written

confirmation would be forthcoming but cautioned that the "government works slow."  *Id*. at 68-

69.  Nevertheless, Fodse and Lutte told the Brace family they could begin their work at "any

time."  *Id*. at 62.  Randall inquired, "What are you going to do when you get calls?" and was told

that "all calls will be directed to the EPA."  *Id*.  Ronald Brace offered a similar account of these

events during his own deposition.  *See* Ronald Brace Depo., ECF No. 214-32, at 19-21, 53-57, 64-65.

Defendants have also proffered the affidavit of Ronald Bosworth, a former legislative aide to then Pennsylvania State Senator Mary Jo White, who was also present at the July 24, 2012 site visit.  According to Mr. Bosworth, Fodse and Lutte "verbally agree[d]" to designate as "agricultural ditches" Elk Creek and "all the ditches connecting to Elk Creek north and south of Lane Road," including those located within the Consent Decree Area.  Bosworth Affid., ECF No. 214-71, at 2.  Mr. Bosworth also attests that Lutte and Fodse "authorize[d] the Braces to go ahead and clean Elk Creek and those ditches to remove the excess vegetation and sediment and the beaver dams present north and south of Lane Road to get the properties back into crop production. *Id*. at 2-3.  Moreover, he recalls "having heard Mr. Brace inform Mr. Lutte and Mr. Fodse that the fields then under water would be placed back into corn production as they had authorized, except for the field at the southcentral portion of the Consent Decree Area which these federal representatives said should not be encroached."  *Id*. at 3.  Mr. Bosworth "do[es] not recall Mr. Lutte or Mr. Fodse saying anything to the Braces that would indicate they could not place these fields back into corn production." *Id*.

3.   Events Following the July 24, 2012 Site Visit

Defendants acknowledge that Randall and Ronald began work in and around the Consent Decree Area soon after the July 24, 2012 visit had occurred. Indeed, Defendants frankly admit in their brief that "they proceeded in the summer and fall of 2012 to clean (excavate, side-cast, clear and plow) that area" in order to facilitate "agreed upon" drainage "via installation of drainage tile." ECF No. 317 at 12.  Both Randall and Ronald acknowledged during their depositions that vegetation was cleared from the Consent Decree Area and corn planted there, except in the back

central portion which, they claimed, Lutte had told them to keep out of. *See* Randall Brace

Depo., ECF No. 214-33, at 25-26, 67-68; Ronald Brace Depo., ECF No. 214-32, at 20-24, 63-64;

*see also* ECF Nos. 214-65 and 214-66.  Robert Brace admitted that tile drains were reinstalled

within the Consent Decree Area in the same places where they had previously been removed.

Robert Brace Depo., ECF No. 207-5 at 165, 172.  Randall and Ronald Brace confirmed that, at

their father's direction, they undertook the reinstallation of tile, with Ronald laying the tile and

Randall digging outlets and hooking the tile together.  Randall Brace Depo. at 37-38, 55-57;

Ronald Brace Depo. at 40-53, 58.   According to Defendants, "[their] actions were undertaken in

good faith as comprising normal ditch maintenance activities incident to normal farming

practices in detrimental reliance upon these federal agency officials' verbal representations at

[the time of the July 2012 site visit]."  ECF No. 317 at 12-13.

On December 19, 2012, Scott Hans, Chief of the Corps' Regulatory Branch, issued a

letter stating that "approximately 4,750 linear feet of an unnamed tributary (unt) to Elk Creek

and Elk Creek are jurisdictional waters of the United States," and "a portion of the channel in

question is located within the 30-acre wetland area subject to the September 23, 1996 Consent

Decree. . . ."  ECF No. 207-14.  As such, "the approximately 4,750 feet section of that channel is

not eligible for the Section 404(f) exemption, and a permit is required for any maintenance or

other activities in the channel."  Noting that "maintenance dredging and clearing may have

already occurred" in that area (as well as in wetlands area located on the Marsh Farm), Mr. Hans

directed Defendants to "immediately Cease and Desist any discharge of dredged or fill material

into the waters of the United States. . . ."  *Id*.  Mr. Hans further requested that an additional site

visit be arranged with the EPA in order to "clarify jurisdiction and review unauthorized

activities."  *Id*.  To facilitate the site visit, Mr. Hans requested that Defendants provide the EPA

"a map, along with drawings depicting all limits of the proposed activities, a delineation of existing streams and wetlands, and a description of any other potential activities in or near waters of the United states on your property . . . ." *Id*.

On January 17, 2013, Robert Brace wrote Lutte regarding the Corps' Cease and Desist letter and the activities that the Defendants had carried out on both the Murphy and Marsh Farms following the July 24, 2012 site visit. Brace stated to Lutte that "both you and Fodse agreed that the ditches met the agricultural exemption [from the CWA's permitting requirements] and that we could proceed with cleaning them in order to remove the excess water affecting my farm fields and maintain our existing drainage system." ECF No. 214-37. With regard to the adjacent Marsh Farm, Brace recalled having indicated his intent to farm that property. *Id*. Brace also acknowledged having "cleaned the ditch" that ran north of Lane Road to Sharp Road "as we had discussed on site." *Id*. He noted "[t]his is the area that we indicated you may get some calls on and you told us not to worry, that all calls should be directed to the EPA. You made it known that EPA was taking the lead in this and that all other agencies no longer had jurisdiction." *Id*. With respect to the Consent Decree Area, Brace advised Lutte that

> shortly after our [July 24, 2012] meeting we began proceeding with our clean up and maintenance efforts, taking care to avoid the southern back section from Lane Road (where the 30 acre wetland is located) as you requested. *The only work that was performed on the land south of Lane Road was ditch cleaning.* You had indicated to both of my sons, Randy and Ronnie, that this was allowed, *as long as we stayed out of the back 30 acre wetland area. Be assured, we did not disturb that area.*

*Id*. (emphasis added).

By correspondence dated March 20, 2013, Lutte acknowledged the EPA's receipt of information that Robert Brace had provided concerning Defendants' activities on the Waterford properties, as requested in the Corps' prior Cease and Desist Letter. ECF No. 214-46. After

reviewing the material, Lutte advised Brace that actions such as "channel widening and/or deepening" might violate the Consent Decree. *Id*. With respect to the upland Marsh Farm, Lutte noted that the Defendants' installation of drainage tiles may have adversely impacted jurisdictional waters of the United States, which would necessitate Defendants acquiring a CWA permit. Lutte requested that Brace arrange another site visit in May "to determine the extent and type of activities that transpired and to determine an appropriate resolution." *Id*.

Over the course of the next six weeks, Lutte and Pamela Lazos of the EPA traded emails with Robert Brace about the scheduling of a follow-up site visit. ECF Nos. 214-48, 214-50, 214-52. Brace expressed particular concern about a 15-acre parcel on the Marsh Farm, which he wanted to treat with lime and plant corn on. ECF No. 214-48. Although Brace was eager to conduct the visit in advance of the Spring planting season, the meeting did not occur until June 27, 2013 due to budget constraints at the EPA. ECF Nos. 214-48, 214-50, 214-52. On that date, officials visited the Marsh Farm only.

Subsequently, Jeffrey Lapp of the EPA and Scott Hans of the Corp issued a joint letter addressing the issue of whether Defendants' activities on the Brace Farms were exempt from CWA permitting requirements under the "agricultural exemption" set forth in Section 404(f) of the Act, 33 U.S.C. §1344(f). ECF No. 207-15. By correspondence dated August 29, 2013, the EPA and Corps issued their determination that "the majority of work" Defendants had performed on their contiguous properties were not exempt from the permitting requirements of the Clean Water Act. In pertinent part, the letter recounted the following:

> On July 24, 2012 a joint site visit was conducted by EPA and the Corps. During the site visit, staff represented that the removal of sediment from Elk Creek and its tributaries south of Lane Road was exempt from regulation under the Clean Water Act. At this site visit, the channels were laden with sediment, from adjacent agricultural activities, and the boundaries of the Consent Decree were not clearly identified. Subsequent to the site visit, Ms. Rhonda McAtee requested by email

dated July 31, 2012 that approximately 0.9 miles of channel from Sharp Road, under Lane Road, and extending to Greenlee Road be labeled as operating under the farming exemptions.  No map, drawing, delineation or permit application was ever submitted.

Upon further consideration and review, the Government's field determination was made in error; the reaches of Elk Creek and its tributaries on your property are not agricultural ditches.  Additionally, portions of these channels are within the 30-acre wetland site covered by the 1996 Consent Decree.  Because your performance of the sediment removal relied on information erroneously provided by the Government, we will exercise our enforcement discretion and forego any further action regarding the sediment removal activities already completed in Elk Creek at this location.  Please note that any future work involving a discharge of dredge or fill material within this area requires a Department of the Army Permit.  While we recognize that historically modifications have been made to Elk Creek and its tributaries, those modifications do not convert that watercourse into an agricultural ditch and thus, maintenance activities performed in the reaches of Elk Creek and its tributaries withn the subject properties are not exempt from regulation under Section 404(f) of the Clean Water Act.

It also appears that portions of the area subject to the Consent Decree may have been converted to agricultural use, and a tributary to Elk Creek may have been filled and rerouted.  A Department of the Army permit was not issued for these activities, and they are <u>not</u> exempt from regulation under Section 404(f).  These activities were not discussed nor authorized during the July 24, 2012 site visit.  Because the extent of these activities was not investigated during the June 27, 2013 site visit, they will require further review and investigation to determine if a violation of the Clean Water Act or the Consent Decree has occurred.

* * *

ECF No. 207-15 at 4-5.[3]  The agencies admonished Defendants not to perform any additional

work unless first they got written approval from the Corps and/or the EPA.  *Id*. at 5.

On November 13, 2013, Fodse and Officer Jim Smolko of the Pennsylvania Fish and

Boat Commission participated in a fly-over of the Brace properties.  During this aerial

---

[3] The EPA/Corps also determined that Defendants had unlawfully converted wetlands on the Marsh Farm by installing tile drains, constructing ditches, and side-casting fill material.  ECF No. 207-15 at 2.  Those activities subsequently gave rise to a separate enforcement action wherein judgment was entered in favor of the United States.  *See United States v. Brace*, Case No. 1:17-cv-6 (ECF No. 158), *reported at* 2019 WL 3778394 (W.D. Pa. Aug. 12, 2019), *affirmed,* No. 20-1892, 1 F.4th 137 (3d Cir. June 11, 2021).

inspection, the Fodse and Smolko took pictures and observed corn rows and trenching within the Consent Decree Area.  ECF No. 214-55;  Fodse Depo. at 173-175.

Defendants' activities within the Consent Decree Area were further documented during a site visit that was conducted on May 20, 2015 by agents of the EPA, the Corps, the Pennsylvania Department of Environmental Protection, and the Pennsylvania Fish and Boat Commission. During the course of the site inspection, EPA representatives observed, among other things, that substantial portions of protected wetlands had been cleared, drained, plowed and planted.  In addition, ten drain outlets were noted in and along the channel of Elk Creek and its unnamed tributaries within the Consent Decree Area.  The inspectors also concluded that the check dam had been removed from Elk Creek and an unauthorized earthen crossing had been constructed in Elk Creek.  See ECF No. 207-20 at 3.

### D.  Recent Procedural History

On January 11, 2016, the EPA issued written notice alleging that Defendants had violated the Consent Decree by discharging dredged and/or fill material in the protected wetlands area, by installing drain outlets in and along Elk Creek and its tributaries, by clearing, draining, plowing, and planting portions of the Consent Decree Area, and by removing the check dam. ECF No. 207-20 at 3.  After the parties' attempts to negotiate a resolution failed, the Government filed its initial motion to enforce the Consent Decree on January 9, 2017.  ECF No. 82.

A protracted period of discovery and motions practice ensued, the details of which are not germane to the Court's ruling herein.  It will suffice merely to note that, ultimately, the Government filed its Second Motion to Enforce the Consent Decree on March 15, 2018.  ECF

No. 206.  Defendants filed their Redrafted 60(b)(5) Motion to Vacate the Consent Decree and Deny Stipulated Penalties, ECF No. 313, on May 20, 2020.  We consider each motion in turn.

### III.     THE GOVERNMENT'S MOTION TO ENFORCE

A.  Governing Legal Standards

Courts have "'inherent power to enforce compliance with their lawful orders through civil contempt.'" *Shmuely v. Transdermal Specialties, Inc.*, No. 17-cv-01684, 2019 WL 3002942, at *3 (E.D. Pa. July 10, 2019)(quoting *Spallone v. United States*, 493 U.S. 265, 276 (1990)).  *See also Harley-Davidson, Inc. v. Morris*, 19 F.3d 142, 146 (3d Cir. 1994) (failure to obey a court judgment is indirect contempt absent extraordinary circumstances like fraud or impossibility).  To  hold a party in civil contempt, the complainant must establish, by clear and convincing evidence: (1) that a valid court order existed; (2) that the alleged contemnor had knowledge of the order; and (3) that the alleged contemnor disobeyed the order.  *LabMD, Inc. v. Tiversa Holding Corp.*, No. CV 15-92, 2021 WL 396737, at *3 (W.D. Pa. Feb. 4, 2021) (citing *Loftus v. S.E. Pa. Trans. Auth.*, 8 F. Supp. 2d 464, 467 (E.D. Pa. 1998)).  *See also Harley-Davidson, Inc.*, 19 F.3d at 146 ("To support a finding of contempt, Harley–Davidson was required to establish by clear and convincing evidence that Morris' conduct was in violation of the terms of the consent judgment.").

Because a consent decree issued upon the stipulation of the parties has the characteristics of a contract, contract principles govern its construction. *McDowell v. Philadelphia Hous. Auth. (PHA)*, 423 F.3d 233, 238 (3d Cir. 2005).  Accordingly, consent decrees, like contracts, should be enforced according to their terms when the terms are unambiguous.  *Id*.  "Whether the decree is unambiguous is a question of law that the Court decides by considering whether, from an objective standpoint, [the decree] is reasonably susceptible to at least two different

interpretations." *Id*. (alteration in the original; internal quotation marks and citation omitted).  If the consent decree is ambiguous, the court may look to extrinsic evidence of its meaning; however, any "ambiguities that persist must be construed against the party seeking enforcement." *Id*. (citations omitted).  "This rule avoids imposing obligations on the parties that they did not bargain for, and it ensures that a party has fair notice of what the decree requires before the serious sanction of contempt is invoked."  *Id*. (citations omitted).

In this case, Defendants do not dispute that the Consent Decree is a valid court order, nor do they dispute their knowledge of it.  Instead, the parties' disagreement centers around whether Defendants violated the terms of the Consent Decree and/or whether their conduct gives rise to liability for stipulated penalties.

B.  The Provisions of the September 23, 1996 Consent Decree

As approved by then-presiding U.S. District Judge Sean J. McLaughlin on September 23, 1996, the Consent Decree permanently enjoined the Defendants, "their officers, directors, agents, servants, employees, successors, assigns, and those in active concert or participation with them … from discharging any pollutants (including dredged or fill material) into the approximately 30 acre wetland site depicted on Attachment A [to the Consent Decree] unless such discharge is in compliance with the CWA."  ECF No. 207-2, ¶3.  The Consent Decree further required Defendants to undertake certain restorative measures in accordance with the "wetlands restoration plan," which was also attached as "Exhibit A" and incorporated into the Consent Decree.  ¶4.

As set forth in "Exhibit A" to the Consent Decree, "[t]he primary objective of [the Wetlands Restoration Plan] is to restore the hydrologic regime to the U shaped, approximately 30-acre wetlands adjacent to Elk Creek.  In order to restore the hydrology to the area, the

21

drainage tile system currently located in the wetlands is to be disabled, surface ditches filled in, and a check dam constructed."  ECF No. 207 at 8.  To that end, the Wetlands Restoration Plan delineated specific tasks that had to be undertaken relative to each of the three restorative measures.  ECF No. 207-2 at 8-9.

C.  Defendants' Alleged Violations

The United States does not dispute that Defendants initially complied with the terms of the Consent Decree, including the specific measures outlined in the Wetlands Restoration Plan. Nevertheless, the Government contends that Defendants later violated the terms of the Consent Decree in several respects:  first, by installing tile drains in the Consent Decree Area after having initially removed the drains; second, by excavating surface ditches within the Consent Decree Area; third, by removing or moving the check dam; and fourth, by plowing and planting crops within the Consent Decree Area.

Except with respect to the alleged removal of the check dam (which is discussed in more detail below), there is no genuine dispute as to *what* actions Defendants undertook within the 30-acre Consent Decree Area.  Rather, Defendants argue that the Government's enforcement motion should be denied because:  (a) there are equitable grounds to vacate the Consent Decree, (b) their actions within the Consent Decree Area were expressly authorized, (c) even if the Government did not expressly authorize their conduct, the Government is still is estopped from challenging their conduct, (d) the Consent Decree is ambiguous and must be interpreted in Defendants' favor, and (e) the Government cannot demonstrate any violations of the Consent Decree by clear and convincing evidence.

The Court will first consider whether the Government has satisfied its evidentiary burden relative to alleged violations of the Consent Decree.  To the extent the Government has done so,

the Court will consider Brace's various defenses and the appropriateness of the Government's requested relief.

      1.  INSTALLING TILE DRAINS

Based upon its review of the evidentiary record, the Court finds that there is clear and convincing evidence that Defendants installed tile drains within the Consent Decree Area in violation of the Consent Decree terms.  The Government's proof in this regard is predicated on numerous uncontested sources.  First, in September of 2012, an official from the Pennsylvania Fish and Boat Commission photographed the Defendants' installation of tile drain in the Consent Decree Area.  *See generally* ECF No. 236-8 at pp. 12-22; J. Smolko Dep., ECF No. 236-9, at 59.  Second, Lutte has provided a sworn declaration in which he attests that, during a May 20, 2015 site visit, he personally observed numerous drainpipe outlets within the Consent Decree Area that were located along Elk Creek or its associated tributaries.  Lutte also photographed these drainpipe outlets, and the Government has proffered these photographs in support of its motion.  See Lutte Decl., ECF No. 226-1, ¶¶ 28-29; photographs at ECF No. 83-15.  Third, during the May 2015 site visit, both Brace and his son Randy admitted to laying tile drains within various points in the Consent Decree Area for the purpose of draining the area so that they could prepare the area for planting.  Lutte Decl. ¶¶26-27.  At his subsequent deposition in this case, Brace again admitted that he directed the installation of the tile drain in "the same places I tore them out of."  Robert Brace Depo. at 165, ECF No. 207-5; *see also id*. at 172 (Brace affirming that he reinstalled the tile drain "everywhere" that he had previously "ripped it out").  And Ronald and Randy Brace confirmed during their own depositions that they helped lay tile within the Consent Decree Area, each marking on a map the locations within the Consent Decree Area where tile had been laid.  *See* Randall Brace Depo. at 38-39; Ronald Brace Depo. at 45-46; *see also* ECF

Nos. 207-17 and 207-18.  Ronald admitted that he ran the tile machine and Randall testified that

he was involved in "hooking" the tiles together and digging outlets.  Ronald Brace Depo. at 40;

Randall Brace Depo. at 37-38, 54-55.  Both Randall and Ronald confirmed that the purpose of

the tile drains was to take water from the soil so that the land could be farmed.  Randall Depo. at

55; Ronald Depo. at 58.

Moreover, there is clear and convincing evidence that Randall and Ronald Brace acted at

the direction of, and on behalf of Defendants Robert Brace and Robert Brace Farms, Inc.  See

Randall Brace Depo. at 54 (confirming that his "father" told him to install the tile drain within

the Consent Decree Area); Ronald Brace Depo. at 90 (stating that his "dad" directed him to

install the tile drain).

Although Defendants challenge the sufficiency of the Government's evidence relative to

certain alleged violations, they do not challenge the sufficiency of the Government's proof as it

relates to the installation of tile drains within the Consent Decree Area.  Implicitly, therefore,

Defendants concede that the Government has produced clear and convincing evidence of their

involvement in laying tile drains within the Consent Decree Area.  Rather than challenge the

sufficiency of the evidence, Defendants suggest that they did not violate the terms of the Consent

Decree because they did not reinstall tile drains in the *same area* where they were originally

required to remove similar drains.

This argument is belied by Robert Brace's admission that he directed the installation of

tile drains in the same areas where drains had previously been removed pursuant to the Consent

Decree remediation plan.  Robert Brace Depo. at 165, 172.  In any event, however, the Court

finds that the distinction – even if factually supported -- is of no legal moment.  This is because

the installation of tile drains *anywhere* within the Consent Decree Area violates the clear purpose

24

and intent of the Consent Decree by disrupting the hydrologic regime of the protected wetlands.

Accordingly, the Government has demonstrated by clear and convincing evidence that

Defendants violated the terms of the Consent Decree by installing tile drains within the Consent

Decree Area.

     2.  EXCAVATING SURFACE DITCHES

     The Government also has presented evidence that the Defendants excavated surface

ditches in the Consent Decree Area.  The Government's proof is as follows.  First, Fodse

observed, during a November 2013 flyover of Brace's properties, that a "trench" or "ditch" had

been excavated in the southeastern portion of the Consent Decree Area.  Fodse Depo., ECF No.

207-16 at 174-75.  Subsequently, during his May 2015 site visit, Lutte observed two surface

ditches cut into the south side of Elk Creek that discharged to the southern border of the Brace

property within the Consent Decree Area.  Lutte Decl. ¶30.  Lutte photographed these ditches

and the Government has produced those photographs in support of its motion.  *See* photographs

15-18 at ECF No. 83-15; *see also* photos at ECF No. 236-8 at pp. 15-18.  Brace acknowledged

during his deposition that he directed Randy to excavate a ditch at a point within the Consent

Decree Area so that water "coming around the beaver dam could roll back into the ditch."

Robert Brace Depo., ECF No. 207-5, at 185-86; ECF No. 207-19.  Brace claimed, however, that

he undertook these measures at the direction of Lutte following the July 2012 site visit.  *Id.*

     In their brief, Defendants counter that the United States has failed to establish that the

two surface ditches photographed by Lutte are the "very same two original ditches that [they]

had 'plugged' pursuant to Task 2" of the Consent Decree remediation plan.  ECF No. 317 at 26.

In fact, Defendants insist they have not touched either of the two surface ditches described in

Task 2 of the Consent Decree Restoration Plan, "which remain plugged to this day."  *Id.*  As to

25

those two ditches, Defendants assert that one is currently submerged under water and therefore inaccessible to them, and the other visibly remains plugged. *Id*. at 27-28.

Based upon affidavits submitted by Ronald and Randall Brace, Defendants acknowledge that, "shortly after the July 24, 2012 on site visit, [the Brace sons] excavated the isolated ditch depicted in the May 20, 2015 onsite visit photo #17" taken by Lutte.  ECF No. 317 at 28. Defendants claim that this "isolated ditch" was excavated roughly in the area that Brace identified during his deposition and is not actually connected to any tributary of Elk Creek, so it does not drain any waters from the Consent Decree Area. *Id*.  Defendants further claim that the "exclusive" purpose of this ditch was to "serve as a physical boundary to ensure that Defendants would not inadvertently enter or impact the southcentral portion of the Consent Decree Area" which – they claim – is the only portion of the Consent Decree Area that Lutte told them they could not farm. *Id*.

Having fully reviewed the evidence cited by both parties, the Court finds that the Government has presented clear and convincing evidence that Defendants violated the Consent Decree by excavating at least one ditch within the area of the protected wetlands.  The affidavits of Ronald and Randall Brace comport with Robert Brace's prior testimony that a ditch was excavated in a location within the Consent Decree Area that Robert identified by marking the area on a map with a "D."  *See* Robert Brace Depo., ECF No. 207-5, at 185-86; ECF No. 207-19 (ditch identified with "D").  Defendants acknowledge that this ditch is depicted in Lutte's photo numbered "17."  ECF No. 317 at 28.  Defendants' various assertions that the ditch is "isolated" from Elk Creek and its tributaries, that it was only intended as a boundary marker rather than a channel for drainage, and that it is not one of the two ditches identified in "Task 2" of the Consent Decree Restoration Plan are beside the point.  By excavating an unauthorized ditch, the

Defendants' conduct violated the Consent Decree's injunction against discharging unpermitted dredged or fill material into the protected wetlands.  Their conduct also contravened the Consent Decree's stated objective of restoring the hydrologic regime of the wetlands because, as Lutte explained in his declaration, ditches allow for the accumulation of water and thereby have an adverse impact on the surrounding water table.  *See* Lutte Decl., ECF No. 226-1, ¶12 (explaining that "[f]illing the surface ditches prevents the accumulation of water into the ditches, allowing the hydrology to evenly disperse and returning the water table to its previous level"); *id*. ¶32 (explaining that Defendants' conduct "again disrupted the hydrologic regime of the [wetlands] Site and reversed the restoration required by the Consent Decree); ECF No. 83-15, photo #17 (depiction of isolated linear cut/ditch within the Consent Decree Area holding water).

### 3.   Moving and/or Removing the Check Dam

Paragraph three of the Wetlands Restoration Plan required Defendants to install a "check dam" in "unnamed tributary A" at a location specified on the Consent Decree map.  ECF No. 207-2, ¶3.  The plan directed that "[t]his dam shall be one and one-half (1½) feet high, four (4) feet long, and as wide as the tributary bottom.  The dam shall be constructed of concrete, gabions, or compacted rock."  *Id*.  During the course of their May 2015 site visit, Fodse and Jeffrey Lapp of the EPA observed that the check dam was not in place.  Lapp. Depo., ECF No. 236-51, at 254-55; Lutte Decl., ECF No. 226-1, ¶31.  As described by Lutte and depicted in his contemporaneous photograph, the dam "had been removed from Elk Creek, and an unauthorized earthen crossing was observed in Elk Creek."  Lutte Decl. ¶31; see also ECF No. 83-15, photo #12.

The Government concedes that "[i]n 1996, Mr. Brace installed the concrete check dam in Elk Creek, as required by the Consent Decree's Restoration Plan."  ECF No. 322 at 17 (citing

evidence).  Based on the conditions observed by Lutte, however, the Government concludes that Defendants must have removed the check dam from its original location at some unspecified point between 1996 and May of 2015.  *Id*. at 18.

For their part, the Defendants concede that the check dam, as it currently exists, is not in compliance with the requirements of the Consent Decree's Wetlands Restoration Plan.  They note, for example, that "the check dam as installed is approximately several hundred yards to the east of [its required] location."  ECF No. 317 at 29.  The Defendants also note that the dimensions of the check dam do not comply with the specifications in the Wetlands Restoration Plan as the dam is actually larger in height, width, and length than the Consent Decree requires. *Id*. at 30-32.

Notwithstanding these discrepancies, Defendants deny that they ever repositioned or removed the check dam.  Instead, Defendants appear to be arguing that the dam presently sits at the same location where it was originally installed.  They posit that the "channel [may have] narrowed" over time "as the result of encroaching natural growth."  ECF No. 317 at 32.  They note that the blocks were "long submerged under water" and "enveloped in several feet of sediment," which might account for "their eroded appearance."  *Id*.  And they suggest that the cement blocks may have been "inadvertently" moved in connection with their "authorized ditch maintenance activities in the Consent Decree Area[.]"  *Id*.  Finally, Defendants suggest that the federal government is actually responsible for moving the location of the check dam, since an official from the U.S. Department of Agriculture was onsite taking photographs at the time the check dam was installed.

Having reviewed all of the evidence presented on this point, the Court makes the following observations.  First, it is undisputed that the check dam, as it currently exists, is not in

the location specified by the Consent Decree's Wetlands Restoration Plan. Second, the Consent Decree unambiguously places responsibility for the restoration work upon the Defendants. *See* Consent Decree, ECF No. 207-2, ¶4 ("Defendants will perform restoration in accordance with the wetlands restoration plan, which is attached hereto as Exhibit A and made a part hereof."). Third, Brace admitted in prior testimony that he carried out the measures set forth in the Wetlands Restoration Plan with the help of an agent (an old friend whom Brace referred to as "Showman"). *See* Brace testimony, ECF No. 236-5, at 133-135; Brace Depo., ECF No. 236-11, at 157-59. Fourth, Lewis Steckler, a former employee of the U.S. Department of Agriculture's Natural Resource Conservation Service, was present at Brace's property in December 1996 when the remedial work was carried out. Steckler Decl., ECF No. 236-10, ¶1, 3-4. Steckler observed and photographed the work pursuant to requests made by the U.S. Department of Justice and the U.S. Fish and Wildlife Service. *Id*. ¶¶3, 5. However, as set forth in Steckler's uncontested declaration, he did not direct anyone to deviate from the specifications in the Wetlands Restoration Plan, nor did he ever discuss the location and size of the check dam to be installed. *Id*. ¶¶5-6.

Based upon the foregoing, the Court finds, by clear and convincing evidence, that the Defendants are technically in violation of the Consent Decree Wetlands Restoration Plan, as they bear responsibility for ensuring that the restorative measures are carried out in the manner specified by the Consent Decree plan. On the other hand, given the uncertainty concerning how the check dam came to be in its present state, whether it was purposefully moved or simply installed incorrectly,[4] and whether the dam, as it exists, has essentially fulfilled its intended

---

[4] Notwithstanding the Government's concession that Brace initially complied with the provisions of the Wetlands Restoration Plan, the Government has not offered any clear and convincing proof that the check dam was originally installed at the proper location and in accordance with the Consent Decree's specification. Although Steckler's

purpose (i.e., "to back up water and rehydrate the surrounding land"), ECF No. 226-1, ¶32, the Court will not assess penalties relative to this alleged violation.

### 4.  CLEARING, PLOWING, AND CROPPING THE CONSENT DECREE AREA

Finally, the Government contends that the Defendants violated the Consent Decree by converting large portions of the Consent Decree Area to agricultural use by clearing brush and/or vegetative cover, plowing or otherwise disturbing the earth, and planting corn in the protected wetlands.  These activities were observed during both the November 2013 flyover and the May 2015 site visit.  *See* Fodse Depo., ECF No. 207-16, at 173-75; Lutte Decl.¶ ¶22, 26, 29; ECF No. 83-13 (flyover photos); ECF No. 83-15 (photos 1-3, 19 and 20).  Lutte further confirmed during the May 2015 inspection that Defendants had discharged dredged and/or fill material into approximately 18 acres of wetlands within the 30-acre wetland Site covered by the Consent Decree.  Lutte Decl. ¶29.

Defendants do not dispute that these activities occurred; instead, as discussed below, Defendants insist that they were authorized to conduct farming activities within the Consent Decree Area.  To that end, Brace and/or his sons acknowledged at their depositions that:  (i) vegetation was cleared from the Consent Decree Area, *see* Randall Brace Depo at 67-68; Ronald Brace Depo. at 60, 63; (ii) heavy machinery was used to plow or otherwise move earth in the area, *see* Randall Brace Depo. at 35-38, 55-57, 67-68; Ronald Brace Depo. at 30-32, 40-41, 48-49, 63-64, 99; (iii) corn was planted and harvested from the Consent Decree Area, *see* Randall Brace Depo. at  25-27, 69-70; Ronald Brace Depo. at 21-23; ECF Nos. 214-65 and 214-66; and

---

contemporaneous photographs of the check dam's installation were offered into evidence at the trial in *Brace II*, they have not been made part of the record for purposes of these proceedings. Therefore this Court is left only with photographs of the check dam as it existed in May of 2015.

(iv) dredged or fill material was discharged at various points within the area, *see* Randall Brace Depo. at 36-38, 56; Ronald Brace Depo. at 48-49, 63- 64, 99.  Moreover, it is evident from the record that these activities were carried out at Brace's behest or direction, and Defendants have never argued otherwise.  *See, e.g.,* Randall Brace Depo at 9-10 (stating that he has the title of "President" of Brace & Sons, Incorporated, which is engaged in the business of farming, but that he really just performs labor and his father runs the company).

The Court therefore finds, by clear and convincing evidence, that Defendants violated the Consent Decree's injunction prohibiting them from "discharging any pollutants (including dredged or fill material) into the approximately 30 acre wetland site," unless the discharge was "in compliance with the CWA."  ECF No. 207-2, ¶3.  The Court also finds, by clear and convincing evidence, that Defendants essentially converted large portions of the Consent Decree Area to agricultural use, thus violating the restoration plan's "primary objective" of restoring "the hydrologic regime" of the wetlands.  ECF No. 207 at 8.

### D.  Defendants' Argument that the Consent Decree Should be Vacated

Defendants contend that, irrespective of their conduct, the Government's motion should be denied because the Consent Decree itself should be vacated pursuant to Rule 60(b)(5) of the Federal Rules of Civil Procedure.  The merits of Defendants' pending Rule 60(b)(5) motion are discussed in more detail below but, for present purposes, it suffices merely to note that the rule provides prospective relief only.  *See* Fed. R. Civ. P. 60(b)(5) (providing that "[o]n motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding" where "applying it prospectively is no longer equitable.").  Consequently, Rule 60(b)(5) may not be invoked as a retroactive defense for a party's self-help measures, when those measures violate the terms of a valid court order or decree.  *See*, *e.g., O'Sullivan v. City of*

*Chicago*, 396 F.3d 843, 868 (7th Cir. 2005) ("A party may not simply ignore [a consent] decree because it believes that factual or legal changes since the decree's entry renders continued enforcement illegal or inequitable.  Rather, Rule 60(b) provides an avenue to seek relief from some or all of the requirements of the original decree."); *accord Halderman v. Pennhurst State Sch. & Hosp.*, 673 F.2d 628, 637-38 (3d Cir. 1982) (holding that "the merits of the underlying order may not be called into question in a post-judgment civil contempt proceeding" . . .  Any other holding would be an open invitation to any party subject to an injunction to resort to self-help whenever in its view some change in the law warranted relief from a judgment."); *United States v. United Mine Workers*, 330 U.S. 258, 293 (1947) ("An order issued by a court with jurisdiction over the subject matter and person must be obeyed by the parties until it is reversed by orderly and proper proceedings."). Thus, assuming for the sake of argument that Defendants could establish grounds to prospectively vacate the Consent Decree under Rule 60(b)(5), those grounds would not excuse their *prior* conduct that violated the Consent Decree's unambiguous terms.

   E.  Defendants' Claim of Express Authorization

   Defendants next argue that, irrespective of their conduct or the terms of the Consent Decree, the United States is not entitled to seek redress "for the simple reason that it expressly authorized the conduct at issue."  ECF No. 317 at 16.  According to Defendants, Fodse and Lutte "expressly authorized [them] to dredge, remove sediment, and 'to farm' the areas adjacent to Elk Creek and its tributaries south of Lane Road located within the Consent Decree Area, which Defendants reasonably understood as including the planting of those areas with crops." *Id*.

   This line of argument lacks merit for two reasons.  First, the Defendants' account of the July 24, 2012 site visit is belied in material respects by the contemporaneous historical record

that is before the Court.  Here, both sides agree, and the evidence is clear, that the Government

agents discussed "ditch cleaning" and the removal of sediment from Elk Creek with Brace;

however, nothing in the parties' "real time" written correspondence suggests that Fodse and

Lutte ever discussed (much less authorized) more disruptive activities within the Consent Decree

Area, such as the laying of tile lines or conversion of the wetlands to agricultural use.  On the

contrary, Brace's letter to Lutte on January 17, 2013 expressly acknowledged that Lutte had

"requested" that Defendants " avoid the southern back section from Lane Road (where the 30

acre wetland is located) . . . ."  ECF No. 214-37 at 1; see id. at 2 (recalling Lutte's instruction

that "ditch cleaning . . . was allowed, as long as [Defendants] stayed out of the back 30 wetland

area").  This acknowledgment is consistent with Lutte's contemporaneous memorialization of the

site visit, in which Lutte recalled "reiterat[ing] that regardless of the dispensation of the ditch that

the 30 acres under the Consent Decree must be preserved as wetlands in perpetuity."  ECF No.

236-30 at 3.

Brace's understanding in this regard is underscored by his inaccurate representation to

Lutte that Defendants had complied with the foregoing restrictions by engaging only in ditch

cleaning and by "taking care to avoid" the wetlands so as to "not disturb that area."  ECF No.

214-37 at 1-2.  It is also informative that Brace enclosed in his letter an aerial photograph of his

properties in which he depicted areas where drain tiles were installed, notably omitting any

reference of the drainage tiles that were added within the Consent Decree Area.  See ECF No.

236-7.  Brace's acknowledgment that he was to leave the Consent Decree Area undisturbed

comports with the testimony of his daughter, Rhonda McAtee, who helped draft the January 17,

2013 letter.  According to McAtee, the letter was meant to convey that the Defendants "would

not have encroached on the designated Consent Decree Area.  McAtee Depo., ECF No. 236-6, at 71-73

Moreover, while Defendants maintain that Brace was given leave to "farm" certain portions of the Consent Decree Area, the written communications between the parties reveal that it was actually areas of the *Marsh Farm* -- or perhaps an area of the Murphy Farm just north of the Consent Decree Area (referred to as the "Contour Field")  -- that was discussed as an anticipated area of farming.  *See, e.g.,* ECF No. 214-37 at 1 (Brace January 17, 2013 letter to Lutte, discussing his recent acquisition of the Marsh property and the fact that he had previously indicated his "inten[tion] to farm the property"); *id*. at 2 (discussing a "ditch" partially located on the Marsh property and recalling "[t]his is the area that we indicated you may get some calls on and you told us not to worry, that all calls should be directed to the EPA"); ECF No. 214-48 (May 6, 2013 email to Lutte discussing Brace's plans to spread lime on 15 acres of the Marsh property and Brace's desire to plant corn there); ECF No. 236-30 (Lutte's notes from July 24, 2012 site visit memorializing Randall Brace's expressed "interest in planting crops . . . South of Lane Road in an area that abutted the 30 acres and appeared to be uplands as there were no hydrophytes growing and the area appeared to be higher in elevation than the 30 acres; Lutte noting his indication "that provided there were no drainage features installed . . . [Defendants] can go immediately up to the line of the 30 acres under the [Consent Decree]"); Randall Brace Depo. at 24-25 (discussing the "contour field" north of the Consent Decree Area; ECF No. 214-65 (map of Brace Properties referenced by Randall Brace in describing the "contour field").

The affidavit of Ronald Bosworth is not to the contrary.  Mr. Bosworth claims to have heard Lutte and Fodse authorize the removal of beaver dams and the cleaning of Elk Creek and ditches connecting to it, so that Brace could "get the properties back into crop production."  ECF

No. 214-71 at 2-3.  Mr. Bosworth does not specify which fields the federal agents specifically talked about, but his statement *is consistent* with Brace's stated desire to farm portions of the Marsh property; it is also consistent with Lutte's recollection that he authorized farming outside of the Consent Decree Area in what Randall Brace referred to as the "Contour Field."  Bosworth also claims *Brace told the agents* that "the fields then under water would be placed back into corn production as they had authorized, except for the field at the southcentral portion of the Consent Decree Area which these federal representatives said should not be encroached."  ECF No. 214-71 at 3.  Mr. Bosworth did "not recall" Lutte or Fodse "saying anything to the Braces that would indicate they could not place these fields back into production."  *Id*.   However, the agents' alleged silence in this regard is an insufficient basis for inferring that they *expressly authorized* Brace to disrupt the hydrologic regime of the Consent Decree Area by draining, clearing, plowing, and cropping the wetlands.  This is especially so given that Mr. Bosworth's stated recollection of events that occurred nearly six years prior to his affidavit is in direct conflict with the parties' contemporaneous records and communications.  And while Defendants have submitted other exhibits in support of their "express authorization" theory, it suffices simply to note that the Court has reviewed Defendants' evidence and finds no plausible basis for inferring that "the authorization granted by Fodse and Lutte necessarily covered all conduct the Government now claims to be in violation of the Consent Decree[.]"  ECF No. 317 at 17.

Second, even accepting the Defendants' historical account at face value, their claim that they obtained "express authorization" for their activities in the Consent Decree Area is legally untenable.  Underlying Defendants' argument is the assumption that the Government's agents have the power to authorize conduct which is otherwise prohibited under the terms of the Consent Decree.  This assumption is misguided because, while a consent decree "is in some

respects contractual in nature . . . , a decree is also in the form of a judicial order that the parties expect will be subject to the rules generally applicable to other judgments and orders." *Holland v. New Jersey Dept. of Corrections*, 246 F.3d 267, 276 (3d Cir.2001) (citation omitted). *See also* ECF No. 207-2, ¶12 ("Upon approval and entry by this Court, this Consent Decree will have the effect and force of a final judgment."). Defendants cite no authority for the proposition that litigants may, of their own accord, and without leave of court, alter the terms of a court's final judgment. And in fact, the Decree in this case expressly provided that "[a]ny stipulated modification of this Consent Decree *must be in writing*, *signed by the parties*, *and approved by this Court*." ECF No. 207-2, ¶12 (emphasis supplied). Because the Government's alleged authorization of the Defendants' challenged activities within the Consent Decree Area ran counter to the express terms of the Decree, such authorization would have, in essence, constituted an amendment of its terms; however, no terms of the Consent Decree could be validly amended unless the changes were placed in writing by the parties, signed, and approved by the Court. Those preconditions did not occur here. Thus, the Court finds no merit in Defendants' theory that the Government's alleged authorization of their conduct relieves them of liability.

F.  Equitable Estoppel

Alternatively, Defendants argue that the United States is estopped from enforcing the terms of the Consent Decree by virtue of its alleged authorization. Here again, Brace's argument lacks merit.

To maintain an estoppel defense against the Government, Defendants must demonstrate that to their "detriment," they "reasonably relied upon" a "misrepresentation" by the Government, and that there was "affirmative misconduct," as opposed to mere omission or

36

negligent failure, by the Government, *United States v. Asmar*, 827 F.2d 907, 912 (3d Cir. 1987), or that there existed "rare and extreme circumstances," *United States v. Pepperman*, 976 F.2d 123, 131 (3d Cir. 1992).  A government official's "oral expression of opinion" is insufficient grounds for estoppel.  *Pediatric Affiliates v. United States*, 230 F. App'x 167, 170–71 (3d Cir. 2007).

Here, Defendants base their estoppel argument on "Fodse and Lutte's express verbal authorization to engage in the activities the Government now says constitute violations."  ECF No. 317 at 21.  This "express verbal authorization," Defendants insist, constitutes "a misrepresentation," which they relied upon to their detriment.  *Id.*  Defendants further claim that the Government did not retract its authorization until August 2013, during which time they engaged in the disputed "ditch maintenance activities" over the course of two growing seasons. *Id.* at 22.  In addition, Defendants fault the Government for delaying its issuance of a final "compliance order," delaying its jurisdictional determination, and delaying the present enforcement action – all of which, Defendants claim, deprived them of timely administrative or judicial review and/or increased their exposure to stipulated damages.  *Id.* at 22-23.

Regarding Defendants' latter averments, the Court finds that the Government's alleged delays cannot serve as the basis for estoppel, since mere inaction does not amount to a misrepresentation or affirmative misconduct.  Defendants also cannot successfully premise their estoppel argument on the alleged "express verbal authorization" given by Fodse and Lutte.  As a factual matter, for the reasons previously discussed, the Court cannot fully credit the Defendants' account of the June 24, 2012 site visit – particularly their assertion that Fodse and/or Lutte gave verbal authorization for Defendants to clear, drain, plow, and plant crops in the Consent Decree Area.

Even if the Court were to accept Defendants' factual allegations at face value, however, their estoppel argument would still fail as a matter of law.  As discussed, Fodse and Lutte had no authority to allow Defendants to engage in conduct that would have violated the express terms of the Court's Decree.  And, "as a general rule, 'those who deal with the Government are expected to know the law and may not rely on the conduct of government agents contrary to law.'" *United States v. City of Hoboken*, 675 F. Supp. 189, 199 (D.N.J. 1987) (quoting *Heckler v. Community Health Servs. of Crawford Cty*., 467 U.S. 51, 63 (1984)).  That is especially true in this case, where the long and protracted history of litigation has centered around the Government's consistent efforts to protect the jurisdictional wetlands within the Consent Decree Area.  Given that:  (i) the Government originally sued Brace to enjoin his unpermitted discharges within the Murphy Farm wetlands, (ii) the Court of Appeals specifically found Brace's unpermitted discharges in the wetlands to be in violation of the CWA, (iii) an express purpose of the ensuing Consent Decree was the remediation of Brace's prior disruptions to the wetlands, (iv) Brace was therefore expressly prohibited from engaging in further unpermitted discharges in the wetlands and was required to undertake extensive remedial measures to restore the hydrology of that area, and (v) the Government's correspondence prior to July 2012 reminded Brace of his obligations relative to the Consent Decree Area, Defendants could not have reasonably relied on the alleged verbal authorization of Fodse and Lutte when they undertook their various earth-moving activities within the Consent Decree Area.

At most, Defendants have shown that Fodse and/or Lutte may have rendered negligent opinions during the July 2012 site visit, which were never reduced to writing.  But "[an] oral expression of opinion simply does not rise to the level of an estoppel."  *Pediatric Affiliates*, 230 F. App'x at 170; *see also Heckler v. Cmty. Health Servs. of Crawford Cty., Inc.,* 467 U.S. 51, 65

(1984) (estoppel cannot be erected on the basis of oral advice); *Schweiker v. Hansen*, 450 U.S. 785, 788 (1981) ("Lower federal courts have ... consistently refus[ed] to estop the Government where an eligible applicant has lost Social Security benefits because of possibly erroneous replies to oral inquiries.") (citing cases); *United States v. St. John's Gen. Hosp.*, 875 F.2d 1064, 1070 (3d Cir.1989) (court finding that estoppel did not apply where the alleged misrepresentation was based on inadmissible hearsay rather than written correspondence).  Nor is mere negligence on the part of government officials a sufficient basis for invoking estoppel.  *See United States v. One Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber, Serial No. LW001804*, 115 F. Supp. 3d 544, 576–77 (E.D. Pa. 2015), *aff'd sub nom. United States v. One (1) Palmetto State Armory PA-15 Machinegun Receiver/Frame, Unknown Caliber Serial No. LW001804*, 822 F.3d 136 (3d Cir. 2016) (court noting that "affirmative misconduct requires something far more than mere negligence" and concluding that the Government's initial, erroneous approval of the plaintiff's application to construct a machine gun did not rise to the level of "affirmative misconduct") (internal quotation marks and citation omitted).  For this very reason, Judge Rothstein rejected a nearly identical estoppel argument asserted by Defendants in *United States v. Brace (Brace III),* No. 17-cv-6 (W.D. Pa.), a CWA enforcement action concerning wetlands on the Marsh Farm.  *See id.,* 2018 WL 9815251, *8 (W.D. Pa. July 31, 2018) (granting judgment in favor of the Government on Brace's estoppel defense, because "Defendants' reliance on the EPA employee's oral assertions [was] unreasonable as a matter of law") (citations omitted).  Like Judge Rothstein, the undersigned concludes, as a matter of law, that Defendants' estoppel defense lacks any viable basis.

G.  Alleged Ambiguities in the Consent Decree Map

Defendants also contend that the Consent Decree's map of the protected wetlands area is ambiguous.  Indeed, they point to the alleged ambiguities in the Consent Decree map as the reason for Fodse and Lutte's "false authorization" relative to activities conducted within the Consent Decree Area.  And because they believe the Consent Decree map is ambiguous, Defendants insist that it must be construed in a manner favorable to themselves.

As a general principle, Defendants are correct that they are entitled to have any ambiguities in the Consent Decree construed in their favor.  *See McDowell,* 423 F.3d at 238 (consent decrees are construed like contracts and ambiguities unresolved by the extrinsic evidence must be construed against the party seeking enforcement).  But the alleged ambiguities in the Consent Decree map are entirely unrelated to the arguments Brace has proffered in defense of the Government's enforcement motion.  To the extent Brace was legitimately confused about the activities that he could lawfully carry out within the Consent Decree Area, that confusion (by his own account) arose from what he claims he was told by federal agents, not from any misunderstanding about the boundaries of the Consent Decree Area.  On the contrary, Brace's awareness of the wetlands area and the Consent Decree injunction were allegedly the reasons why he sought authorization in the first place.  And Brace apparently understood the Consent Decree Restoration Plan requirements well enough to fulfill them in 1996, within the span of a few days.  *See* ECF No. 236-5 at 134 (Brace testifying that it took "the better part of two-and-a-half, three days" to complete the remedial measures).  Accordingly, any alleged ambiguities in the Consent Decree map do not alter the Court's prior conclusion, based upon clear and convincing evidence, that the Defendants violated the terms of the Consent Decree.

H.  Assessment of Penalties, Costs and Fees

Having thus determined that Defendants violated the provisions of the Consent Decree and its Wetlands Restoration Plan through their various activities within the Consent Decree Area, the Court next considers the issue of appropriate remedial and/or punitive measures.

The Government requests that the Court once again order Defendants to restore the Consent Decree Area consistent with the original Wetlands Restoration Plan.  In addition, the Government requests that the Court assess stipulated penalties in an amount of $750 per day (i.e., $250 for each of the three restorative measures that Defendants breached), commencing January 11, 2016 (the date of the Government's notice of violations) and continuing through to the present date.  Further, the Government requests that the Court order Defendants to pay "any expenses and costs incurred by the United States in enforcing [the] Consent Decree," as set forth in Paragraph 8 of the Consent Decree.  ECF No. 207-2.  Lastly, the Government requests that the Court modify the Consent Decree so that the stipulated penalties increase from $250 to $500 per day after the first thirty days of noncompliance, and then increase to $1,000 per day after sixty days of noncompliance.  ECF No. 286 at 25-26.

Defendants contend that the Government's requested relief is "inequitable, contrary to the terms of the Consent Decree, and well beyond what the Government's own expert concluded Defendants had the ability to pay."  ECF No. 317 at 35.  Defendants insist that this Court has the equitable discretion to reject the Government's request and should accordingly refrain from assessing any penalties at all.

Having considered the parties' respective positions, the Court will defer ruling on the Government's request for stipulated penalties and costs at this time.  Instead, the Court will order the parties to meet and confer with the goal of developing a plan that outlines specific measures

41

Defendants should undertake, and a general timetable for completion of those measures, in order to restore the Consent Decree Area in a manner consistent with the original Wetlands Restoration Plan.  The Court will defer rendering a final decision on monetary penalties until after the costs of the remedial measures are determined and adequate financial resources have been allocated towards the completion of those measures. The Court will retain jurisdiction of this matter so as to provide continued oversight relative to the development and successful completion of the necessary restorative measures.

In adopting this course of action, the Court notes that it is similar to the approach taken by Judge Rothstein in *Brace III,* where Defendants are currently developing a restorative plan for wetlands located on the Marsh Farm.  As Judge Rothstein suggested in her February 27, 2020 "Order on Remedy," the deferral of monetary penalties pending remediation efforts will allow the parties to prioritize rehabilitation of the subject wetlands, consistent with the goals of the Clean Water Act, and will also allow the Court to assess the Defendants' good faith moving forward.  *See Brace III*, Case No. 17-cv-6 (W.D. Pa.), ECF No. 178 ("Order on Remedy" dated Feb. Feb. 27, 2020).  The Court declines to modify the Consent Decree penalties at this time, but it will entertain the possibility of revisiting this issue should future events so warrant.

## IV.     DEFENDANTS' MOTION TO VACATE THE CONSENT DECREE

The Court next considers Defendants' Motion to Vacate the Consent Decree and Deny Stipulated Penalties.  ECF No. 313.  Defendants' motion is made pursuant to Federal Rule of Civil Procedure 60(b)(5), which permits a court to modify a consent decree if "applying it prospectively is no longer equitable...." Fed.R.Civ.P. 60(b)(5).  "[A] party seeking modification of a consent decree bears the burden of establishing that a significant change in circumstances warrants revision of the decree." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 383 (1992).

To meet its burden, the moving party generally must establish at least one of the following by a preponderance of the evidence: "(1) a significant change in factual conditions; (2) a significant change in law; (3) that '[the] decree proves to be unworkable because of unforeseen obstacles'; or (4) that 'enforcement of the decree without modification would be detrimental to the public interest.'" *Democratic Nat'l Comm. v. Republican Nat'l Comm*., 673 F.3d 192, 202 (3d Cir. 2012) (quoting *Rufo*, 502 U .S. at 384).  In addition, the reviewing court should "respond to the specific set of circumstances before it by considering factors unique to the conditions of the case," *id*. (citation omitted), including:

> [a] the circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented; [b] the length of time since entry of the injunction; [c] whether the party subject to its terms has complied or attempted to comply in good faith with the injunction; and [d] the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction.

*Id*. (citation omitted). "In weighing these factors, the court must balance the hardship to the party subject to the injunction against the benefits to be obtained from maintaining the injunction' and the court should also 'determine whether the objective of the decree has been achieved." *Id*. (internal quotation marks and citation omitted).

In this case, Defendants contend that significant factual and legal changes have rendered continued enforcement of the Consent Decree inequitable and unworkable.  The Government denies that any relevant or significant changes have occurred as would justify relief under Rule 60(b)(5).  Further, the United States insists that Defendants' motion is untimely.  We consider the latter argument first, then turn to the substance of Defendants' request for relief.

A.  The Timing of Defendants' Motion

Motions seeking relief under Rule 60(b)(5) must be made "within a reasonable time." Fed. R. Civ. P. 60(c)(1).  What constitutes a "reasonable time" depends on the circumstances of each case.  *See In re Diet Drugs (Phentermine/Fenfluramine/Dexfenfluramine) Prod. Liab. Litig.*, 383 F. App'x 242, 246 (3d Cir. 2010) (citing *Delzona Corp. v. Sacks*, 265 F.2d 157, 159 (3d Cir. 1959)).  Consideration is given to factors such as finality, the reason for delay, the practical ability for the litigant to learn of the grounds relied upon earlier, and potential prejudice to other parties.  *Id*. (citing *Kagan v. Caterpillar Tractor Co*., 795 F.2d 601, 610 (7th Cir.1986); *Ashford v. Steuart*, 657 F.2d 1053, 1055 (9th Cir.1981)).

In this case, nearly twenty-two (22) years elapsed between entry of the Consent Decree and Defendants' initial filing for relief under Rule 60(b).  The government notes that this time period "far exceeds the outer limits of what the Third Circuit and courts within the Circuit have deemed a 'reasonable time.'"  ECF No. 318 at 18 (citing authority).  There is ample case law to support this assertion.  *See, e.g., Zied v. Barnhart*, 716 F. App'x 102, 104 (3d Cir. 2017) ("A motion under Rule 60(b)(1)-(3) must be filed within one year of the judgment that is challenged, and a motion under Rule 60(b)(5)-(6) must be filed "within a reasonable time." . . . .  Zied filed her motion more than four years after this Court's judgment, which is plainly untimely under either standard.") (citing Fed. R. Civ. P. 60(c)(1)); *Thomas v. Schlosser*, 670 F. App'x 56, 57 (3d

44

Cir. 2016) (court conducting same analysis and noting that a motion filed "more than 15 years after the adverse judgments" was "plainly untimely under either standard."); *Williams v. City of Erie Police Dep't*, 639 F. App'x 895, 897–98 (3d Cir. 2016) (denying motion that was filed seventeen months after judgment); *Moolenaar v. Gov't of the V.I.*, 822 F.2d 1342, 1348 (3d Cir. 1987) (holding that a Rule 60(b)(6) motion filed almost two years after judgment was not made within a reasonable time); *Martinez-McBean v. Gov't of Virgin Islands*, 562 F.2d 908, 913 n.7 (3d Cir. 1977) (expressing "serious doubts" that a Rule 60(b)(6) motion filed two and a half years after entry of the challenged order met the "reasonable time" requirement); *Bd. of Trs. Nat'l Elevator Indus. Health Benefit Plan v. McLaughlin*, Civ. No. 12-4322, 2017 WL 6550489, at *3 (D.N.J. Dec. 20, 2017) (motion considered untimely where it was filed twenty-three months after judgment); *Tokley v. Ricci*, Civ. No. 09-4546, 2017 WL 1181588, at *4 (D.N.J. Mar. 30, 2017) (noting that "the general one-year limit remains a rule of thumb" absent a showing of extraordinary circumstances outside of the movant's control that prevented filing the motion sooner) (quoting *Gordon v. Monoson*, 239 F. App'x 710, 713 (3d Cir. 2007)); *Smalis v. Huntington Bank*, 565 B.R. 328, 334–35 (W.D. Pa. 2017) (requested relief from consent judgment, made eight years after judgment, was not filed within a "reasonable time"); *accord Simmons v. Twin City Towing*, 425 F. App'x 401, 403 (5th Cir. 2011) (motion for relief filed nine years after judgment was untimely under any circumstances); *United States v. Krilich*, 152 F. Supp. 2d 983, 992 (N.D. Ill. 2001), *aff'd*, 303 F.3d 784 (7th Cir. 2002) (denying Rule 60(b) motion filed eight years after consent decree entered).

Given that Defendants did not seek Rule 60 relief until more than two-decades after entry of the Consent Decree, the Court is hard-pressed to see how their motion can be considered timely. Considerations of other relevant factors -- i.e., the practical ability of Brace to learn of

the grounds relied upon earlier, the reason for delay, the interest in finality, and potential prejudice to other parties -- confirms that Defendants' motion has been filed out of time.

### 1. DEFENDANTS' ABILITY TO LEARN OF THEIR RULE 60(B) GROUNDS EARLIER

Defendants predicate their request for prospective relief upon: (i) alleged ambiguities in the Consent Decree and the accompanying restoration plan, (ii) "unforeseen factual circumstances" that have supposedly rendered continuing enforcement of the Consent Decree "unworkable," and (iii) "significant" changes in the law that have resulted in "inequitable" circumstances.  ECF No. 321 at 1.  But each of these purported bases for vacating the Consent Decree was known or knowable long before Defendants first sought relief under Rule 60(b).

#### a. *Alleged Ambiguities in the Consent Decree*

A significant portion of Defendants' opening brief is directed at their argument that that the Consent Decree contains various "latent" ambiguities.  While acknowledging that the Consent Decree's primary objective was "restor[ing] the hydrologic regime" of the 30-acre wetlands area, ECF No. 207-2 at 8, Defendants assert that the term "hydrologic regime" remained "latently ambiguous" because the remediation plan failed to reference "*any* objective federal wetland hydrology standard," ECF No. 314 at 11.  Defendants also claim that the Consent Decree is ambiguous as to the precise geographic scope of the wetlands area, because neither the EPA nor the Corps ever performed "a proper on-the-ground wetland identification or delineation" involving "survey flags and other markings to precisely distinguish uplands from wetlands." *Id*. at 16.  In addition, Defendants argue, the Consent Decree never defined the precise temporal "regime" to which the wetlands area had to be restored.  *Id*. at 20.

Notwithstanding the Defendants' labeling of these "ambiguities" as "latent," however, each one should have been discernable from the face of the Consent Decree itself.  Still, Defendants agreed to be bound by the Consent Decree's terms and never sought to clarify any purported ambiguities prior to April 2018, when they filed their first Rule 60(b) motion.  ECF Nos. 215, 216.  Courts faced with much shorter delays have rejected Rule 60 motions as untimely, notwithstanding a movant's assertion that the underlying court order was ambiguous.  *See, e.g., Glover v. Johnson*, 934 F.2d 703, 708–09 (6th Cir. 1991) (relief denied where defendants argued that consent order was ambiguous but had never asked the court to "clarify, explain, or modify" the ambiguous language "in the decade since the order was served"); *N.L.R.B. v. Sw. Bell Tel. Co*., 730 F.2d 166, 173 n.7 (5th Cir. 1984) (finding vagueness claim untimely six years after consenting to consent decree's terms); *United States v. Schafer*, 600 F.2d 1251, 1253 (9th Cir. 1979) (defendant could not challenge a consent decree on "vagueness" grounds where, during four year period following entry of decree, defendant took no steps to seek modification);  *Rawlins ex rel. Wyatt v. King*, 803 F. Supp. 377, 389–91 (M.D. Ala. 1992) (finding a vagueness claim untimely six years after consent decree entry); *Salazar v. Dist. of Columbia*, 570 F. Supp. 2d 105, 109–10 (D.D.C. 2008) (finding an ambiguity claim untimely after 18 months*), rev'd in part on other grounds*, 602 F.3d 431 (D.C. Cir. 2010*);  see also Moolenaar v. Gov't of Virgin Islands*, 822 F.2d 1342, 1348 (3d Cir. 1987) (Rule 60(b)(6) motion brought two years after entry of judgment was untimely where "the reason for the attack upon that judgment was available for attack upon the original judgment").

Defendants also reference a "Latently Ambiguous Second Objective" of the Consent Decree Restoration Plan, the exact nature of which is difficult to discern from their highly convoluted argument.  To this Court's understanding, Defendants are asserting that:  (i) the

USDA had designated the Consent Decree Area as one involving the "commenced conversion" of a wetland; (ii) under applicable USDA regulations, Defendants could have completed that conversion by planting and harvesting at least one additional crop in 1989 and/or 1990; (iii) had they achieved "prior converted cropland" status prior to January 9, 1995, the Consent Decree Area would have effectively been grandfathered out of the CWA's permitting requirements; but (iv) various federal agencies stymied Defendants' efforts to complete their production of agricultural commodities for purposes of achieving "prior converted cropland" status by "over-implementing" federal environmental law.  See ECF No. 314 at 33 et seq.  Setting aside the lack of substantive merit in this argument (which is discussed in more detail, infra), the Court notes that it is premised on a series of events which predated the Consent Decree.  *See id*. at 33-64. Brace proffers no cogent explanation as to why he lacked the ability to assert this Rule 60(b) argument in a more timely fashion.

### b.  *Unforeseen Factual Circumstances*

Defendants premise their request for prospective relief partly on "unforeseen factual circumstances" that, they claim, have rendered continuing enforcement of the Consent Decree inequitable and unworkable.  ECF No. 314 at 68, *et seq*.  According to Defendants, these changed circumstances involve:  (a) unexpected delays on the part of government agencies in helping Defendants address flooding on their property: (b) the EPA's alleged refusal to consider amendments to the Consent Decree or "localized solutions" to the periodic flooding; (c) the alleged efforts by EPA and the Corps to secure federal jurisdiction over areas outside of the Consent Decree Area; (d) Defendants' recent discovery that federal and state agencies had promoted the restoration of beaver populations in Northwest Pennsylvania; (e) a recently acquired expert report that analyzes the impact of beaver dams and obstructed culverts on the

48

water levels in Elk Creek and tributaries flowing through the Consent Decree Area.  Here again, Defendants' "practical ability to learn" of these alleged unforeseen changes significantly predates the filing of their Rule 60(b) motion.

Most of the foregoing events relate to alleged flooding on Brace's property that was caused by beaver dams and obstructed culverts.  Defendants, however, have been aware of these issues for years.  *See,e.g., Brace II,* 72 Fed. Cl. at 340 ("Beavers have traditionally lived on and around the [Consent Decree] site.  Due to the presence of Beaver dams, portions of the Murphy Farm have periodically been inundated with water.").  The administrative delays about which Defendants complain occurred between 2008 (when Defendants first sought assistance in removing beaver dams that were causing debris to clog their agricultural ditches and two culverts) and 2011 (when an EPA representative first visited the Brace Farm).  *See* ECF 314 at 68-70.  Yet at no time prior to April 2018 did the Defendants seek relief before this Court in the form of a Rule 60(b) motion to modify the terms of the Consent Decree.

In asserting that the EPA refused to consider amendments to the Consent Decree or "localized solutions" to the periodic flooding, Defendants seemingly allude to the Government's change of position relative to the dredging of Elk Creek, as set forth in the joint EPA/Corps letter of August 29, 2013.  Other aspects of this argument are predicated on statements made by EPA representative Jeffrey Lapp in the 2005 trial before the Court of Federal Claims in *Brace II*.  Again, this information was known to Defendants long before they filed the instant motion.

Defendants' complaint that the EPA and Corps have attempted to secure federal jurisdiction over much of the Brace Farm pertains to the agencies' actions relative to the Marsh Farm, which Brace acquired in 2012.  By Defendants' own admission, they were aware from a Corps letter dated December 19, 2012 that the Marsh tract located adjacent to Elk Creek had

been identified as containing wetlands. ECF No. 314 at 74. In that same correspondence, the agency requested an onsite visit of the entire farm to "clarify jurisdiction and review unauthorized activities." *Id*.; *see* ECF No. 207-14. An onsite visit ensued in June 2013 and, on August 29, 2013, the EPA and Corps issued their joint letter identifying certain unpermitted and unauthorized activities within the Marsh and Murphy Farms. ECF No. 207-15. Defendants acknowledge that, upon receipt of this letter, they "fully realize[d] EPA's broad objective," ECF No. 314 at 74-75, but they claim that, from October 2013 through July 2016, they "engaged in a formidable, but ultimately unsuccessful, good faith effort to amicably resolve" their dispute. *Id*. at 75. Plainly, Defendants were aware of the grounds of this argument long before they sought relief under Rule 60(b)(5).

Another supposedly "unforeseen" factual circumstance is Defendants' discovery that federal and state agencies promoted the restoration of beaver populations in Northwest Pennsylvania through various programs. Defendants' evidence in this regard consists of numerous federal and state publications that are dated between 1987 and 2018. See ECF No. 314 at 84-85; ECF 279-124 through 279-128. Defendants claim this information was not previously known to them but, to the extent it is even relevant to their Rule 60(b) motion, they do not explain why it was unavailable.

Finally, Defendants point to a hydraulic-hydrologic engineering report authored by Donna M. Newell, M.S., P.E. (ECF No. 279-42), as a changed factual circumstance justifying prospective relief. As paraphrased by Defendants, Ms. Newell determined that

> the wetland hydrologic regime of Mr. Brace's uplands had been significantly expanded by the presence of multiple non-removable beaver dams located within and beyond the [Consent Decree Area] during the 2005-2011 period. This resulted generally in extensive sedimentation deposit and debris and significant backwater effects that caused substantial channel surface water level increases and inundation of overbank and adjacent and contiguous areas.

50

ECF No. 314 at 86.  Although Ms. Newell's report was issued in 2018, it imparts no new

information concerning the previously known fact that beavers and clogged culverts were

causing water to collect on Brace's property up until the time the dams were removed in 2011.

Accordingly, Defendants had the "practical ability" to learn of the basis for their Rule 60(b)

motion long before it was ever filed.

### c.   *Unforeseen Legal Changes*

Defendants also point to purported changes in the law as a factor that justifies relief from

the terms of the Consent Decree.  The Court discusses the merits of Defendants' argument in

greater detail below but, for present purposes, it is sufficient merely to note that Defendants cite

the following legal "changes":

(i)   Executive Order 13547, issued on July 19, 2010, entitled "Stewardship of the Ocean, Our Coasts, and the Great Lakes," ECF No. 314 at 89-96;

(ii)  a 2012 Protocol to the Canada-U.S. Great Lakes Water Quality Agreement, *id*. at 96-113;

(iii) Pennsylvania's Constitutional "Public Trust" Obligation, as set forth in the Pennsylvania Constitution, Article I, Section 27 [which dates to 1971], *id*. at 113-115;

(iv)  The October 3, 2008 federal interstate compact regarding water resources in the Great Lakes-St. Lawrence River Basis (previously executed by Pennsylvania and seven other states on December 13, 2005), *id*. at 115-118;

(v)   the removal, in 2001, of the grandfather rule for 1972-1985 CWA §404 non-permitted "Prior Converted Croplands" and "Prior Commenced Conversions," *id*. at 118-122; and

(vi)  a joint regulation issued by the EPA and the Corps on June 29, 2015 covering "Waters of the United States" that potentially broadens the scope of federal jurisdiction over Brace's farm, *id*. at 122-134.

As the foregoing recitation indicates, each purported legal change came into being years

before Defendants first sought relief under Rule 60(b) in April 2018.  Defendants therefore had

the "practical ability" to raise these issues much sooner than they ultimately did.  This consideration weighs against a finding that the Defendants' motion is timely.

2. REASONS FOR DELAY

Despite the belated nature of Defendants' motion, they have offered no persuasive reason for the delay.  In fact, Defendants made no effort at all in their opening brief to justify their belated filing.

After the Government pointed this deficiency out, however, Defendants asserted in their reply brief that the Government's "about-face on the authorization of the conduct at issue and subsequent refusal to compromise on enforcement of the Consent Decree" were "extraordinary circumstances" that justified their delay.  ECF No. 321 at 3.  But the Government's so-called "about face" relative to the July 2012 site visit was made known to Defendants when they received the August 29, 2013 joint determination letter from the EPA and Corps that Defendants' alterations of channels and conversion of wetlands to agricultural use within the Consent Decree Area were not authorized and potentially in violation of the CWA.  ECF No. 207-15.  Indeed, in correspondence dated October 14, 2013, Defendants' counsel expressed "concern [ ] about EPA's most recent 180 degree change of its position regarding the exempt status of my client's drainage ditches at the [Consent Decree Area] site." ECF No. 236-20.  And, while Brace may have attempted to negotiate some type of resolution with the government, he was aware as of January 11, 2016 that the EPA would not agree to his demand that he be allowed to pursue his farming plans within the Consent Decree Area.  *See* ECF No. 207-20.  Moreover, in April 2016 Brace's attorney advised him that the EPA had "a very good chance of winning at least some level of remediation and penalties," ECF No. 207-22; for that reason, Brace's attorney advised him to take steps to "remove the reinstalled tile line" and "agree to reposition the check dam." *Id*.

In sum, the circumstances that supposedly justify Defendants' delay in seeking prospective relief from the Consent Decree occurred at least two years -- and as many as six years -- before they filed their first Rule 60(b) motion. Simply stated, Defendants have failed to proffer any logical or persuasive explanation for their considerable delay in filing the instant motion.

### 3. FINALITY AND POTENTIAL PREJUDICE TO OTHER PARTIES

The conclusion that Defendants did not assert their Rule 60(b)(5) motion "within a reasonable time" is further supported by consideration of other factors, such as the need for finality and the potential prejudice to the Government. Fed. R. Civ. P. 60(c)(1). To review, the Government originally commenced this litigation in 1990 and, following trial and appellate proceedings, the subject Consent Decree was entered on September 23, 1996. As noted, the original iteration of Defendants' Rule 60 motion was filed more than twenty years after entry of the consent judgment. To state the obvious, this litigation has been extraordinarily protracted, has consumed a disproportionate share of judicial resources, and has been costly for both the Government and Brace. Both the Government and public at large have been prejudiced to the extent they have been deprived of the environmental benefits the Government bargained for under for terms under the Consent Decree. In addition, the Government is prejudiced from a strategic standpoint because most of the events that are central to this dispute occurred many years ago. In fact, to a significant degree, Defendants' claims are based upon events and/or circumstances dating back to the 1980s and 1990s. Accordingly, at this juncture, there is a significant danger -- if not an inevitability -- that memories will fade, important witnesses may be unavailable, and/or evidence may have otherwise grown stale, thereby impeding the administration of justice. At this point in time, both the need for finality and the need to avoid

unfair prejudice to the Government militate against a finding that Defendants' satisfied the time constraints of Rule 60(c)(1).

### B. The Merits of Defendants' Motion

Even so, the Defendants' motion also fails on the merits.  As discussed, a Rule 60(b) movant must establish, by a preponderance of the evidence: "(1) a significant change in factual conditions; (2) a significant change in law; (3) that '[the] decree proves to be unworkable because of unforeseen obstacles'; or (4) that 'enforcement of the decree without modification would be detrimental to the public interest.'" *Democratic Nat'l Comm.,* 673 F.3d at 202. Defendants contend that both changed factual circumstances and changes in the law have rendered continued enforcement of the Consent Decree inequitable.  For the reasons set forth below, the Court finds Defendants' arguments unpersuasive.  We consider the alleged factual and legal changes in turn.

### 1. ALLEGED CHANGES IN FACTUAL CIRCUMSTANCES

A central premise of Defendants' Rule 60(b) motion is that the Consent Decree -- by its terms and/or by the manner of its enforcement -- has hampered Defendants' ability to address surface water flooding on the Brace property, which in turn has impaired Brace's farming operations outside of the Consent Decree Area.  *See* ECF No. 313 at 2 (positing, in part, that "Defendants' inability for many years to remove beaver dams . . . without federal and state agency authorization, plus Consent Decree Wetland Restoration Plan design failures, resulted in the significant surface water flooding of the channels/ditches traversing the . .. Consent Decree Area and areas of the Brace Farm located beyond it under normal (non-flood) conditions . . . ."); ECF No. 314 at 65 (asserting that the Government's "design, implementation and enforcement of

the CD Plan has overly and unduly interfered with Defendants' right and ability to farm their land without government regulatory intrusion" and that "Defendants have been denied their constitutional right to utilize their private property on other portions of their hydrologically integrated . . . farm to earn a living in their chosen profession of farming"); *id*. at 85 (positing that "Defendants' Inability to Remove Recurring Beaver Dams and Maintain Flooded and Inundated Agricultural Ditches and Overbank Areas Permit Free Significantly Contributed to CD Plan Failure and Lost Farming Opportunities") (initial capitalization in the original).

Defendants acknowledge that prior episodes of water inundation were the result of certain "known physical phenomena" -- primarily, beaver dams, which triggered the accumulation of sediment and debris in agricultural ditches and two state/county-installed culverts, thereby impeding the drainage of water on their property. ECF No. 314 at 68. They also allude, however, to flaws in the Consent Decree's restoration plan. Further, Defendants maintain that certain "unforeseen changes in factual circumstances" have made continued enforcement of the Consent Decree unworkable. As examples, they cite the Government's "extraordinarily long" delay in responding to their request for assistance relative to the flooding, ECF No. 314 at 68, and the EPA's alleged "refusal" to consider possible amendments to the Consent Decree or "Localized Solutions" to ameliorate the periodic flooding, *id*. at 70. Defendants also cite the "unexpected effort" by the EPA and Corps to "secure federal jurisdiction over much of the entire Brace Farm." *Id*. at 73. Having fully considered these arguments, the Court does not agree that any significant change in factual circumstances has been shown as would warrant relief from the Consent Decree.

>   a.  *The Record Does Not Support a Finding that the Consent Decree or Any Aspect of the Restoration Plan Caused Flooding Outside of the Consent Decree Area.*

As an initial matter, the Court finds no evidence in the record to support the conclusion that the terms of the Consent Decree -- or any aspect of the wetlands restoration plan -- caused an inundation of water outside of the Consent Decree Area or otherwise led to lost farming opportunities for the Brace family.  The Court of Federal Claims previously drew the same conclusion in *Brace II*, when it rejected Brace's claim that the Consent Decree had effectuated a "taking" of his property.  *See* 72 Fed. Cl. at 363 (determining "as a factual matter" that "there is no proof that the area flooded exceeds that which previously was wetlands").

For purposes of this litigation, the United States retained Dwayne R. Edwards, Ph.D., P.E., an expert in surface water resources engineering, to conduct an analysis of possible flooding outside of the Consent Decree Area and the physical impact that any flooding would have had in those areas.  To that end, Dr. Edwards submitted an expert report dated December 18, 2017, and provided a sworn declaration on July 23, 2018 summarizing his conclusions.  *See* ECF No. 216-29 ("Analysis of Potential Flood Magnitude and Severity for Land Surrounding the Consent Decree Area, Robert Brace Farm, Waterford, Erie County, Pennsylvania"); ECF No. 245-4 (July 23, 2018 Decl. of Dwayne Edwards, Ph.D., P.E.).  In conducting his analysis, Dr. Edwards considered the characteristics of the two culverts situated near Sharp Road and Lane Road, the characteristics of the watershed surrounding the Murphy Farm, the characteristics of Elk Creek and its various tributaries, peak flow rates of the water entering the Sharp Road Culvert, the characteristics of two beaver dams that were situated within Elk Creek on the Murphy Farm as of October 2017, the topography of the Murphy Farm and surrounding  areas, and the historical rainfall data as it relates to the watershed that surrounds the Murphy Farm. *See* ECF No. 245-4, ¶6.

Stated succinctly, Dr. Edwards opined that very little, if any, of the farmed land adjoining the Consent Decree Area is prone to flooding, even under extreme conditions. ECF No. 245-4, ¶7; ECF No. 216-29 at 3, ¶8(a). Even assuming the most severe conditions that could reasonably be assumed to occur on the Murphy Farm (meaning, e.g., a 1,000-year storm event, water present to the tops of the banks of Elk Creek, and wetter-than-average soil moisture at the start of the rainfall), Dr. Edwards opined that floodwater would likely enter only 0.3% of the 24 acres of farmable land that adjoins the Consent Decree Area. *Id.* He likened this flood zone to an area of approximately 50 feet by 50 feet, or, alternatively, a "buffer" of 3.5 inches extending outside and along the entire perimeter of the Consent Decree Area. *Id.* Even then, Dr. Edwards predicted that the water would reach a maximum depth of less than two feet and recede entirely in less than five hours. ECF No. 245-4, ¶7; ECF No. 216-29 at 3, ¶8(b). In light of the limited extent, depth and duration of this predicted flooding, Dr. Edwards concluded that, even under extreme conditions, any flooding outside of the Consent Decree Area would likely have no significant impact on the adjoining farm areas or any activities conducted therein. ECF No. 245-4, ¶8; ECF No. 216-29 at 3, ¶8(c).

Defendants, for their part, have proffered the report of Donna M. Newell, M.S., P.E., entitled "Hydrologic and Hydraulic Evaluation of Elk Creek on the Robert Brace Farm." ECF No. 279-42. As described by Ms. Newell, the purpose of her study was "to evaluate the hydraulic conditions of the primary channel of Elk Creek as it traverses the Brace Farm to determine if the structures along Elk [C]reek including the Sharp Road culvert, Lane Road culvert, beaver dams, and the check dam required by the consent decree have increased backwater[ ] for the normal flow[ ] condition and flood events." *Id.* at 5 (internal footnotes omitted). Stated more simply, Ms. Newell sought to determine which phenomena were

contributing to higher water levels on Brace's property.  To that end, Ms. Newell conducted a

hydraulic analysis of five different scenarios that were intended to model conditions on the Brace

Farm, both in 2011 and in 2018.  In relevant part, Ms. Newell made the following conclusions:

- In the past, before the previous five beaver dams were removed, the normal water surface elevation was significantly higher on the Brace Farm due to the presences of the beaver dams. For normal flow conditions, it is estimated that the backwater caused by the five beaver dams extended over 3500 feet upstream of the Sharp Road Culvert. The normal condition water surface elevation with the beaver dams was between 1.1 – 1.8 feet higher than conditions without beaver dams between Sharp Road and Lane Road and between 2.1 to 2.9 feet higher than normal conditions between Lane Road and the check dam.

- Currently, [two beaver dams] located upstream of the Lane Road Culvert cause significant backwater which extends approximately 1600 feet upstream from cross sections 19 to 29, with a maximum increase of 2.9 feet at cross section 21. The beaver dams cause the normal flow to inundate a large portion of the overbanks in these areas.

- [T]he beaver dams on Elk Creek cause significant increases to the normal water surface elevations but do not have a significant impact on the 2-year and higher flood events.

- The beaver dam downstream of Sharp Road is impacting normal flow conditions on the Brace Farm and not allowing the channel to flow during normal conditions.

- The continued presence of beaver dams along Elk Creek could increase sedimentation in the channel and diminish the effective hydraulic conditions of the channel.

- The presences of multiple beaver dams along Elk Creek would cause higher normal water surface elevations, which could limit the ability of the portions of the higher elevation farm lands to properly drain. The hydraulic modeling shows that the raised elevations of the normal conditions is well outside of the channel and north of Lane Road is outside of the area of the consent decree.

ECF No. 279-42 at 6.

Ms. Newell clarified in her deposition that she had not arrived at any "concrete

conclusion" that the ponding of channel water was actually affecting Brace's upland farm areas,

only that such conditions could possibly hinder the draining of the upland farms.  Newell Dep. at

283-84, ECF No. 318-2.  She expressly disavowed having drawn any conclusion that the

"hydrologic regime of Mr. Brace's uplands had been significantly expanded by the presence of

multiple non-removable beaver dams located within and beyond the [Consent Decree Area]

during the 2005-2011 period."  Newell Depo. at 298-300.  Although she referenced one particular location where water inundation from the beaver dams had " increased from approximately 6 feet from the channel centerline to about 235 feet," Ms. Newell observed that "these increases are within the consent decree area." ECF No. 279-42 at 24.  Contrary to Defendants' assertion in their brief, Ms. Newell did not opine that beaver dams had "effectively extended" the Consent Decree Area "beyond its already imprecise boundaries," nor did she conclude that Defendants had been deprived of "many years of crop harvest."  Newell Depo. at 302-303.

Thus, the Edwards and Newell studies either flatly contradict or are inconclusive as to Defendants' assertion that they have lost farming opportunities due to water inundating areas outside of the Consent Decree Area, particularly in their upland fields.  To the extent Defendants are complaining of water that has impeded their ability to farm the adjacent Marsh Site, the Court notes that most of the area on the Marsh Farm is comprised of protected wetlands. *See Brace III,* 2019 WL 3778394, at *1, 21-26 (W.D. Pa. Aug. 12, 2019) (noting that Defendants were charged with clearing statutorily protected wetlands located on a 20.01-acre plot of land, known as the "Marsh Site," and ruling that the Marsh Site contains wetlands that are waters of the United States subject to the CWA), *aff'd*, 1 F.4[th] 137, 140 (3d. Cir. 2021) (noting that the Marsh Site "includes about fourteen acres of wetlands").  As the Marsh Site wetlands are protected by the Clean Water Act, Brace's inability to conduct agricultural operations in that area without a permit does not involve a significant change of factual circumstances justifying vacatur of the Consent Decree.

Defendants appear to argue in their reply brief that, even if flooding is not likely to occur outside of the Consent Decree Area, equitable relief should still be granted because the point of

the Consent Decree was to return the area to the hydrologic regime that existed in 1984 and the Consent Decree Area is (in their view) more wet now than it was in 1984. *See* ECF No. 321 at 5 ("Defendants' point is that since the entry of the Consent Decree, the site flooded *beyond* what was the case in 1984, for multiple reasons, including the overbreadth of the restoration plan and the existence of beaver dams. This presents an unforeseen change in the factual circumstances [that] requires vacatur of the Consent Decree."); *id.* (noting that "Defendants' point . . . is that the *extent* of flooding/wetlands is problematic, because it exceeds the hydrological nature of the site as of 1984."). But even if water saturation in the Consent Decree Area is now greater than it was in 1984, this in no way supports Defendants' claim that they "have been denied their constitutional right to utilize their private property on other portions of their hydrologically integrated . . . farm to earn a living in their chosen profession of farming." ECF No. 314 at 65. Moreover, Defendants' argument overlooks the fact that "the purpose of the remediation plan was to restore the wetlands portion of the Murphy Farm to its state . . . *prior to Mr. Brace's filling activities.*" *Brace II*, 72 Fed. Cl. at 363 (emphasis added). The remediation plan does exactly that. Thus, even assuming the Consent Decree Area is now wetter than it was in 1984, that is not the sort of circumstantial change that renders continued enforcement of the Consent Decree "unworkable" or "inequitable."

To the extent Defendants suggest that the Consent Decree Restoration Plan contains "design failures" that have contributed to their alleged flooding problems, ECF No. 313 at 2, their assertion finds no support in the record. As confirmed by Defendants' own expert, the increased water levels on Brace's property appear to have been caused by beaver dams -- a phenomenon long known by Brace and completely unrelated to the Consent Decree plan. *See Brace II*, 72 Fed. Cl. at 363 ("[I]n terms of causation, it has not been shown that the flooding is

the result solely of the [wetlands] restoration [plan], as there is evidence, including testimony and earlier deposition statements by Mr. Brace, that flooding of this property has occurred in the past, at times attributable to presence of beaver dams."); *id.* at 340 ("Beavers have traditionally lived on and around the site.  Due to the presence of Beaver dams, portions of the Murphy Farm have periodically been inundated with water.").[5]

Defendants nevertheless suggest in their brief that the check dam, which was installed as an element of the Consent Decree's remediation plan, is one of the "physical phenomena" that has contributed to flooding.  This hypothesis is flatly refuted by Ms. Newell, who concluded that "the check dam in its existing location has minimal impact on the normal and higher flood elevations on the Brace Farm."  ECF No. 279-42 at 6; *see also* Newell Dep. at 260 (agreeing that the check dam has "a negligible impact on the water surface elevation on Mr. Brace's farm," regardless of the conditions); *id.* at 250 ("[T]he check dam didn't cause really any impact barely; even at the normal, there was very minimal impact."), ECF No. 318-2.  Further, the check dam would not be a significant factor even if it had been properly installed in accordance with the size specifications and locations designated in the Consent Decree restoration plan.  *See* Newell Report at 6 (concluding that "[i]f the check dam were installed at the as-designed location and

---

[5] Defendants urge this Court to consider "recently discovered evidence" concerning the coordinated efforts of federal and state agencies to restore beaver populations in Northwestern Pennsylvania.  ECF No. 314 at 84-85.  Although Defendants describe these initiatives as "publicly undisclosed," they are spelled out in a number of publications dating back as far as 1987.  *See* ECF Nos. 279-124 through 279-128.  This evidence does nothing to alter the Court's conclusion that Brace has long been aware of the presence of beavers and their relationship to increased water levels on his property.  To the extent Defendants are presenting their recent discovery of these initiatives as a changed factual circumstance, Defendants fail to explain why they could not have discovered this information previously, or why these governmental programs render the continued enforcement of the Consent Decree inequitable.  Moreover, to the extent Defendants are suggesting that the federal government, through these programs, improperly imposed "burdens" on Brace by "creat[ing] man-induced wetlands" on Brace's property, the Court fails to perceive any grounds for equitable relief.  As noted, this is not a new phenomena for Brace and, in any event, it is not the Court's prerogative to use its equitable powers as a means of counteracting lawful executive policy measures.

size, it would have increased normal water surface elevation approximately 0.2 feet and has less than 0.1 feet of increases to the water surface elevations of the 2-year event and above."); Newell Dep. at 261-62 (agreeing that "the check dam is not causing flooding on Mr. Brace's properties," and that "this would remain the case if it would have been installed somewhere else than Elk Creek or in the other location that was specified by the consent decree").  As for other aspects of the wetlands restoration plan, Ms. Newell freely admitted that she was not asked to evaluate -- and therefore was offering no opinion concerning -- the impact on water levels from the removal of drainage tile and filled-in surface ditches.  Newell Dep. at 82-83, ECF No. 318-2.  Defendants have offered no evidence (and do not even try to argue) that these measures somehow adversely impacted their farming opportunities.

 In sum, whatever problems Brace may have experienced with periodic water inundation on his property, those problems are not attributable to the features of the Consent Decree or its wetlands restoration plan.  Moreover, as the Government points out, the phenomena that *do* appear to have played a role in creating backwater problems -- namely, beaver dams, and issues with the state-installed culverts in Elk Creek -- are circumstances of which Brace has long been aware.  See generally ECF No. 318 at 35-36 (discussing evidence of Brace's awareness of these problems dating back to the 1980s and 1990s).  Accordingly, any problems arising from beaver dams and the culverts do not involve the type of changed factual circumstances that can support relief under Rule 60(b)(5).  *See Democratic Nat'l Comm.*, 673 F.3d at 202 ("[C]ourts should not grant modifications or vacatur 'where a party relies upon events that actually were anticipated at the time it entered into a decree.'") (quoting *Rufo*, 502 U.S. at 385).

b.  *The EPA's Response to Defendants' Requests for Assistance Does Not Constitute a Basis for Relief from the Consent Decree.*

Among the "unforeseen changes in factual circumstances" that Defendants cite as grounds for Rule 60(b)(5) relief is the EPA's "extraordinarily long" delay in responding to Defendants' request for assistance with perioding flooding.  ECF No. 314 at 68.  Defendants posit that they "could never have foreseen at the time the [Consent Decree] plan had been fully implemented, that it would take approximately *fourteen and one-half (14 ½) years* (from 12-24-96 to late May 2011) to secure EPA's first-time presence on their farm to even examine these problems!"  ECF No. 314 at 70.  This line of argument is specious, however, as Defendants admit they did not seek the EPA's assistance with these issues until 2008.  *See id*. at 68 ("The record reveals extensive written correspondence from Defendants to EPA, beginning in 2008 regarding beaver dams and accumulation of sediment and debris that clogged their agricultural ditches and two state-and county-installed road culverts, and in removing or adjusting features of the check dam . . . .").  Defendants admit that the "EPA did not then express any reservation about the Pennsylvania Game Commission approving the removal of the five (5) beaver dams that lodged themselves on and around the [Consent Decree Area]."  *Id*. at 70.  And the record shows that, once the five dams were removed in 2011, the water levels on Brace's property receded.  *See* ECF No. 214-37 (Brace referring in correspondence to "water reced[ing]" following the removal of beaver dams); *see also* ECF No. 214-32, Ronald Brace Dep. at 60-61, 103-104;  ECF No. 214-33, Randall Brace Dep. at , ECF No. 214-33 at 89-90.  In this Court's view, the "extensive written correspondence" that ensued between Brace and various federal agents during that three-year period does not evidence "extraordinarily long" administrative delays but, rather, a good faith effort on the part of federal agents to address Brace's concerns

63

about the water levels on his farm, consistent with administrative budget constraints, the

requirements of federal and state environmental law, and applicable regulatory procedures.

Defendants also cite, as a "changed factual circumstance," EPA's alleged "refusal" to

consider possible amendments to the Consent Decree or "Localized Solutions" to ameliorate the

periodic flooding on Brace's property.  ECF No. 314 at 70.  According to Defendants, the EPA's

conduct in this regard demonstrates its "over-enforcement" of the Consent Decree Injunction.

Id.  Here again, the Defendants' argument is specious.

The primary cause of rising water levels on Defendants' property, as discussed, is the

presence of beaver dams, not the remedial measures in the Consent Decree.  Although the EPA is

not responsible for regulating or removing beaver dams, Defendants freely acknowledge that the

EPA "did not object to the Pennsylvania Game Commission removing five (5) beaver dams from

Defendants' farm in 2011, three (3) of which were located within the [Consent Decree Area]."

ECF No. 314 at 70.  In 2018, Brace again sought to remove beaver dams located on his property,

but he concluded that he would need to construct temporary roads in order to access the dams.

To that end, Brace's attorney contacted officials from the Erie County Conservation District, the

Pennsylvania Game Commission, and the Army Corps of Engineers regarding his plans.  *See*

ECF No. 72-7.  By correspondence dated June 8, 2018, Scott A. Hans, Chief of the Regulatory

Division of the Corps, responded to Brace's lawyer, who had requested guidance concerning the

permitting process. ECF No. 318-5.  Hans indicated in his letter that:  (i) the Corps does not

regulate beaver dams or their removal unless it involves the discharge of dredged or fill material

into jurisdictional waters of the United States; (ii) the Corps did not have enough information

about Brace's plans to make a determination as to whether it would require federal permitting;

(iii) Brace should submit a general permit application that identified "all proposed work areas,

64

the extent of waters and proposed fills within such waters, and any proposed disposal areas," *id*.; (iv) Brace could contact Hans for additional information; and (v) members of the Corps staff would be available to assist Brace throughout the permitting process. *Id*.  There is no indication in the record that Brace ever pursued that course of action.  More to the point, no evidence has been presented to show that the EPA "over-enforced" the Consent Decree or otherwise refused to consider "localized solutions" relative to beaver dam issues in 2018.

Defendants also predicate their "over-enforcement" theory on the EPA's/Corps' determination that portions of Elk Creek and certain of its tributaries were not agricultural ditches from which debris and sediment could be removed without a CWA §404 permit.  It is true that the EPA and Corps ultimately overrode the field agents' initial verbal authorization concerning the cleaning of these areas, but -- recognizing that "the Government's field determination was made in error" and that Defendants' "performance of the sediment removal relied on information erroneously provided by the Government" -- the agencies expressly declined to prosecute Brace for those particular activities.  ECF No. 207-15 at 4.  More to the point, the Government's conduct in this regard did not involve any enforcement -- much less an "over-enforcement" -- of the Consent Decree injunction.

Elsewhere in their brief, Defendants maintain that the EPA "over-enforced" the Consent Decree by "effectively prevent[ing] Defendants from securing CWA §404 permits to farm the non-wetland portions of the . . . [Consent Decree Area]" and by denying them "the ability to farm non-[Consent Decree Area] portions of the Murphy farm tract, most of the Marsh farm tract, and the western portion of the Homestead farm tract."  ECF No. 314 at 65.  The basis for this argument is unclear, as there is no indication in the record that Brace ever sought to apply for a §404 permit in the years postdating the Consent Decree.  In addition, as the Government

observes, it is the Corps (not the EPA) that administers the Section 404 permitting program.  In any event, however, Defendants have clearly planted crops in the upland areas of the Homestead Farm as well as areas of the Murphy Farm that lie outside of the Consent Decree Area.  *See, e.g.*, Ronald Brace Depo. at 21-22, 28-31, ECF No. 214-32; Randall Brace Depo. 21-27, ECF No. 214-33.  To the extent Defendants have been denied permission to cultivate portions of the Marsh Farm, that is not the result of EPA's enforcement of the Consent Decree but, rather, the result of administrative and judicial determinations that the Marsh Farm itself contains protected wetlands subject to the Clean Water Act's permitting requirements.  *See Brace III*, 1 F. 4th 137, 140 (3d Cir. June 11, 2021) (affirming district court's entry of summary judgment in favor of the United States for CWA violations and observing that the "Marsh Site adjoins Elk Creek, a tributary of Lake Erie, and includes about fourteen acres of wetlands.").  Insofar as the EPA has prevented Defendants from farming any portion of the Consent Decree Area without a §404 permit, this reflects an appropriate enforcement of the Consent Decree's terms.

Defendants also characterize the instant proceedings as evidence of the Government's "over-enforcement" of the Consent Decree.  But for the reasons discussed at length herein, the Court has found that the Government's motion is well-taken and founded upon clear and convincing evidence of Brace's Consent Decree violations.  As Defendants have been found to be in violation of the Consent Decree, the Government's efforts to seek redress cannot constitute grounds for vacating that same decree.

Defendants' assertion that EPA "unexpected[ly] refused to consider possible amendments to the Consent Decree" is equally meritless.  ECF No. 314 at 70.  No evidence has been presented that Brace ever proposed or sought a particular amendment to the terms of the Consent Decree.  Apparently recognizing this fact, Defendants insist that they made "multiple post-2005

requests to EPA for assistance," which "collectively constituted a request to modify the CD Plan to make it workable for them." *Id*. at 71. Defendants claim that, "[s]ince . . . neither the CD nor the CD Plan had modification/amendment provisions, EPA not only failed to promptly respond to those requests, but also failed to consider them." *Id*.

This argument is factually flawed. Although the Consent Decree did not spell out a detailed amendment procedure, it specifically contemplated that the Court would retain jurisdiction "for the purpose of enforcing, interpreting, *and modifying* this Consent Decree." ECF No. 207-2, ¶12 (emphasis added). The Decree further specified that modifications had to be "stipulated," put "in writing," "signed by the parties," and "approved by [the] Court." *Id*. Thus, in point of fact, the Consent Decree *did* contain a modification provision, but Defendants' various requests for agency assistance over the course of many years cannot reasonably be construed as a "collective request" to modify the decree. In any case, Defendants do not indicate what specific modifications they sought, apart from the Government's non-enforcement of the CWA's permitting requirements. Simply stated, Defendants have not shown that the Consent Decree should be vacated because of the manner in which the EPA has attempted to enforce it.

> c. *The EPA's Actions Relative to the Marsh Farm Do Not Constitute Grounds for Vacating the Consent Decree.*

Another purportedly "unforeseen" change in circumstance concerns the Government's alleged "efforts to secure federal jurisdiction over much of the entire Brace Farm." ECF No. 314 at 73. This line of argument appears to primarily concern the EPA's determination that the Marsh Site contains wetlands subject to the CWA's permitting requirements. Once again, the EPA's conduct in this regard has nothing to do with the terms of the Consent Decree. And, as discussed, the EPA's determination that the Marsh Site contains statutorily protected wetlands

has been validated by Judge Rothstein's ruling in *Brace III*, which was recently affirmed by the

U.S. Court of Appeals for the Third Circuit.  See *Brace III*, 1 F. 4th 137 (3d Cir. June 11, 2021).

   In sum, the Court does not discern any significant change in factual circumstances or

other unforeseen obstacles that would render continued enforcement of the Consent Decree

inequitable and/or unworkable.  Accordingly, Defendants' arguments on those grounds do not

demonstrate a basis for relief under Rule 60(b)(5).

### 2.   ALLEGED CHANGES IN LEGAL CIRCUMSTANCES

   Defendants next argue that a number of changes in federal law since the entry of the

Consent Decree have rendered the Government's continued enforcement of the injunction

provision inequitable.  Defendants cite the following:

   i.   Executive Order 13547, issued on July 19, 2010, entitled "Stewardship of the Ocean, Our Coasts, and the Great Lakes," ECF No. 314 at 89-96;

   ii.   A 2012 Protocol to the Canada-U.S. Great Lakes Water Quality Agreement, *id*. at 96-113;

   iii.   Pennsylvania's Constitutional "Public Trust" Obligation, as set forth in the Pennsylvania Constitution, Article I, Section 27 [which dates to 1971], *id*. at 113-115;

   iv.   The October 3, 2008 federal interstate compact regarding water resources in the Great Lakes-St. Lawrence River Basin (previously executed by Pennsylvania and seven other states on December 13, 2005), *id*. at 115-118;

   v.   The removal, in 2001, of the grandfather rule for 1972-1985 CWA §404 non-permitted "Prior Converted Croplands" and "Prior Commenced Conversions," *id*. at 118-122; and

   vi.    A joint regulation issued by the EPA and the Corps on June 29, 2015 covering "Waters of the United States" that potentially broadens the scope of federal jurisdiction over Brace's farm, *id*. at 122-134.

   Notwithstanding the Defendants' extensive discussion of these various legal "changes,"

the Court perceives nothing in their arguments that would justify vacating the Consent Decree

injunction or its remedial provisions.  Under the "change of law" standard, a consent decree should be modified if "one or more of the obligations placed upon the parties has become impermissible." *Rufo*, 502 U.S. at 388; *Democratic Nat'l Comm.*, 673 F.3d at 202.  In addition, a decree may be modified if "law has changed to make legal what the decree was designed to prevent." *Id*.  No such circumstances are present in this case.

(i)

Defendants first discuss Executive Order Number 13547, which was issued by the Obama Administration in 2010 with the Title "Stewardship of the Ocean, Our Coasts, and the Great Lakes." 75 Fed. Reg. 43023 (July 19, 2010).  ECF No. 314 at 89.  Executive Order 13547 established a number of national policies -- one of them being "to ensure the protection, maintenance, and restoration of the health of the ocean, coastal, and Great lakes ecosystems and resources." *Id*.  In furtherance of its stated policies, the Executive Order expressly adopted the recommendations of the Interagency Ocean Policy Task Force ("IOPTF") and directed that executive agencies implement those recommendations under the guidance of a National Ocean Council.  *Id*.  Defendants' argument focuses on three of the IOPTF's "Final Recommendations."

The first recommendation called for adopting a "precautionary approach" to maintaining the health of the Great Lakes ecosystem, meaning that "[w]here there are threats of serious or irreversible damage, lack of full scientific certainty shall not be used as a reason for postponing cost-effective measures to prevent environmental degradation."  ECF No. 314 at 90 (internal quotation marks and citation omitted).  Defendants posit that, while "prior presidential administrations" have commonly referenced the "precautionary approach" in "publicly reviewable federal documentation . . . , in reality, [the Government] and other treaty signatories to such international agreements implement and enforce the [relevant] legal obligations . . .

69

pursuant to the stronger *European 'Precautionary Principle*,' which 'entails a radical change in outlook,' a bias against the use of technology, and a reversal of the burden of proof." *Id*. (citation omitted, emphasis in the original).

The second recommendation of the IOPTF to which Defendants object calls for the adoption of an "Ecosystem-Based Management" system to account for "the interdependence of the land, air, water, ice and the interconnectedness between human populations and these environments." ECF No. 314 at 92 (internal quotation marks and citation omitted). According to Defendants, Ecosystem-Based Management involves a precautionary approach "which errs on the side of conservation in the event of uncertainty, and shifts the burden of proof for showing that ocean use would impose no major unacceptable impacts from regulators to the economic actor or business." *Id*. (internal quotation marks and citation omitted).

The IOPTF's third recommendation involved a policy of "comprehensive, integrated, 'ecosystem-based coastal and marine spatial planning and management.'" ECF No. 314 at 92. This unified framework envisioned a system of nine-region planning areas that would work toward watershed protection by, among other things, reducing nonpoint source pollution. *Id*. at 92-93. Defendants go on to discuss an implementation plan published by the National Ocean Council -- a body that "evolved from" the IOPTF. *Id*. at 93. According to Defendants, the Council's plan for implementing the foregoing policy initiatives has been "deemed an anathema to the nation's agricultural communities." *Id*. at 95. As support for this proposition, Defendants cite a statement prepared by the Family Farm Alliance in 2016 in connection with Congressional hearings that emphasized how the use of ecosystem-based management "would allow federally dominated Regional Planning bodies to reach as far inland as deemed necessary to protect ocean

ecosystem health" and "create unforeseen impacts to inland sectors such as agriculture . . . ." *Id.* at 96.

What Defendants do *not* explain is how Executive Order 13547 and the IOPTF's recommendations have any direct bearing on the terms of the Consent Decree or its future enforcement.  In fact, as Defendants acknowledge elsewhere in their brief, the 2010 Executive Order was later revoked by the Trump Administration and replaced with Executive Order 13840, which effectuated material changes to the Obama Administration's 2010 Executive Order.  *See* 83 FR 29431-29434 (June 19, 2018).  Furthermore, no aspect of the 2010 Executive Order legalizes the actions that Defendants took in 2012 in violation of the Consent Decree, nor does it render any provision of the Consent Decree impermissible.  Consequently, it cannot serve as a basis for equitable relief.

(ii)

Next, Defendants address, at great length, the EPA's involvement in developing portions of a 2012 protocol for the Great Lakes Water Quality Agreement ("GLWQA"), which the United States and Canada originally entered into in 1972.  According to Defendants, on September 7, 2012, the EPA's Administrator and Canada's Environment Minister executed a "significant amendment" to the GLWQA which essentially incorporated the three recommendations of the IOPTF -- including the European Precautionary Principle, ecosystem-based management, and marine spatial planning.  ECF No. 314 at 97.  Defendants thus argue that Brace will remain subject to these principles, notwithstanding the revocation of Executive Order 13547, because the EPA and other federal agencies will employ these principles in connection with work conducted pursuant to the GLWQA and international treaty law.  *Id.* at 98.

71

Defendants discuss the fact that, under the GLWQA, federal agencies have agreed to take advice and recommendations from the International Boundary Commission, a body established pursuant to a 1909 treaty.  ECF No. 314 at 100.  Defendants' concern here revolves around a 1994 report wherein the Committee recommended a "weight of the evidence" approach in evaluating scientific support for proposed regulatory action -- an approach that allegedly entailed a "focus shift[ ] from whether or not <u>causal</u> relationship have been definitively proven to considering whether a body of direct and/or <u>circumstantial</u> evidence suggest a plauible hypothesis that harm has occurred." *Id*. at 101-102 (emphasis in the original; internal quotation marks and citation omitted; italics omitted).  Defendants appear to be arging that EPA's experts have improperly utilized this "weight of the evidence" approach to reach the erroneous conclusions "that most of the Marsh farm tract constitutes federally protected wetlands," *id*. at 102, and "that historic wetlands had been destroyed" in the Consent Decree Area within the Murphy Farm. *Id*. at 104.

Finally, Defendants expound upon Annex 4 of the GLWQA, which addresses objectives aimed at maintaining and controlling phosphorous concentrations, "algal biomass" levels, and "cyanobacteria biomass" levels within the Great Lakes.  *See* ECF No. 314 at 104-113. Defendants go on to cite various reports which, they maintain, generally demonstrate that Pennsylvania is not a significant source of harmful algae blooms or excessive phosphorus discharges relative to Lake Erie's Central Basin.  *See generally id.; see also* ECF Nos. 279-155, 279-157, 279-158, 279-159,  279-160, and 279-161.  Defendants then conclude that "there exists absolutely no proven evidentiary link at all between Brace farm agricultural activities and the nutrient loading of Pennsylvania's portion of the Lake Erie's Central Basin."  ECF No. 314 at 111.  Further, they insist that, absent evidence of any direct causal link between Brace's farming

activities and environmental harm to Elk Creek, its sub-watershed, and Lake Erie's Central

Basin, this Court should "reinstate Defendants' ability to fully farm [Brace's] integrated and

adjacent Murphy, Marsh and Homestead tracts." *Id*. at 112.

Having fully considered Defendants' arguments, the Court will decline this invitation.

The U.S. Court of Appeals for the Third Circuit long ago settled the question of whether Brace

caused environmental harm when it observed in *Brace I* that the Government had "established

the five elements of a prima facie case for violations of Section 404 of the CWA," including

"that defendants' clearing, mulching, churning, and levelling of the formerly wooded and

vegetated [wetlands] site constituted a discharge of pollutants into the waters of the United

States." 41 F.3d at 120. The only issue in *Brace I* was whether Defendants' discharge of

pollutants were exempt from the CWA's permitting requirement; the Court of Appeals held that

they were not. Even if this Court had the authority to disturb these findings it would not do so on

the basis of Defendants' attenuated logic.

To the extent Defendants are challenging the validity of the EPA's prior determinations

that both the Consent Decree Area and the Marsh Farm contain protected wetlands, these too are

matters that have been fully and finally adjudicated. The status of the wetlands in the Consent

Decree Area was settled in *Brace I,* 41 F.3d at 120 ("defendants stipulated that the site was a

wetland at the time of the discharges"), and the status of the wetlands on the Marsh Farm was

settled in *Brace III,* 1 F.4[th] at 140 (noting that the Marsh Site adjoins Elk Creek, a tributary of

Lake Erie, and includes about fourteen acres of wetlands"). Significantly, no aspect of

Defendants' arguments about the GLWQA concerns the actual terms of the Consent Decree and,

to the extent the GLWQA employs stricter standards for the protection of Lake Erie and its

ecosystem, such provisions are consistent with the goals of the Consent Decree. The provisions

of the GLWQA do not legalize conduct which was previously prohibited, nor do they render the injunctive provisions of the Consent Decree impermissible.  Thus, any changes in the law involving the GLWQA do not serve as a basis for relief under Rule 60(b)(5).

(iii) and (iv)

Brace's next purported bases for relief concern Pennsylvania's Constitutional "Public Trust" Obligation as well as its obligations under the Great Lakes - St. Lawrence River Basin Interstate Water Resources Compact.  ECF No. 314 at 113-118.  As Defendants' observe, the Commonwealth had passed an "Environmental Rights Amendment" as early as 1971, which incorporated the right to a clean environment.  *See* Pa. Const. Art. 1, §27 (conferring upon "[t]he people . . . a right to clean air, pure water, and to the preservation of the natural, scenic historic and esthetic values of the environment," ensuring that "Pennsylvania's public natural resources are the common property of all the people," and establishing the Commonwealth as "trustee of these resources," with an obligation to "conserve and maintain them for the benefit of all the people").

Brace highlights the foregoing Constitutional provision in conjunction with two compacts that Pennsylvania entered into in 2005:  an interstate compact regarding the Great Lakes-St. Lawrence River Basin, which Pennsylvania and seven other states signed on December 13, 2005, and the International Great Lakes-St. Lawrence River Basin Sustainable Water Resources Agreement, which these same eight states signed, along with the Canadian Province of Ontario and the Government of Quebec, on that same date.  ECF No. 314 at 115.  In 2008, Congress consented to and approved the interstate compact, adopting its provisions as federal law.  *See* ECF No. 279-171.

According to Defendants, the "primary purpose of the Compact and corollary state laws is to collectively 'protect, conserve, restore, improve and effectively manage' Basin waters and natural resources cooperatively and internationally, consistent with the European Precautionary Principle, 'because *current lack of full scientific certainty should not be used as a reason for postponing measures to protect the Basin ecosystem*.'"   ECF No. 314 at 116 (emphasis added by Defendants, citing provisions of the interstate compact, ECF No. 279-173, §1.3.2.A,  and the adopting Senate Resolution, ECF No. 279-171, §1.3.2.a).  Defendants note that the interstate compact required Pennsylvania and the other states to develop their own respective programs for the management and regulation of water consumption from the Great Lakes-St. Lawrence River Basin "*in compliance with all* applicable municipal, State and *federal laws* [e.g. Clean Water Act]," as well as regional interstate and international agreements.  ECF No. 314 at 116 (emphasis and alteration added by Defendants, citations omitted).  The states were also required to develop, and report on, their own water conservation and efficiency goals and objectives relative to use of the Basin's waters.  *Id*. at 117.  Based upon these observations, Defendants conclude that:

> because of these enduring PA state, PA interstate, PA federal and PA international law obligations, and EPA's ongoing primary federal role in ensuring CWA § 404 enforcement and implementation of USG GLWQA international law obligations, unless this Court vacates the CD entirely, Mr. Brace and his family will remain subject to EPA over-enforcement of the CD injunction provision without the need for EPA to present empirically derived scientific evidence of environmental harm, and without any hope of ever being treated fairly.

*Id*. at 118.

Again, having given due consideration to Defendants' argument, the Court finds that it provides no justification for affording them prospective equitable relief from the Consent Decree.  Indeed -- like the other purported "legal changes" Brace cites -- the provisions of the Great Lakes-St. Lawrence River Basic compacts have no direct bearing on the terms and conditions of the Consent Decree. The Constitutional provision which Brace cites actually

*predates* the Consent Decree (and therefore cannot constitute a "change" in the law).  And

neither the compacts, nor any provision of state law associated with them, legalize Brace's

unauthorized activity within the Consent Decree Area.  Once again, to the extent the interstate

and international compacts employ a stricter regulatory standard relative to their goal of

protecting the Great Lakes-St. Lawrence River Basin, these changes are consistent with the goals

of the Consent Decree.  Defendants' suggestion that Brace is being unfairly subjected to "over-

enforcement" of the Consent Decree injunction by virtue of the provisions of the interstate/

international compacts is too attenuated to serve as a basis for prospective equitable relief.

(v)

Defendants' next basis for prospective equitable relief concerns a 2001 rule change that

eliminated a grandfathered regulation pertaining to the discharge of dredged material.  To

address Defendants' arguments, some background discussion on this point is required.

On August 25, 1993, EPA and the Corps jointly issued regulations which, in relevant

part: (a) modified the definition of "discharge of dredged material" and (b) codified the agencies'

view that prior converted croplands are not "waters of the United States" over which the EPA

and Corps retain CWA jurisdiction.  58 Fed. Reg. 450080 (Aug. 25, 1993).  With respect to the

first measure redefining "discharge of dredged material," the EPA and Corps sought to "clarify

that mechanized landclearing, ditching, channelization, and other excavation activities involve

discharges of dredged material when performed in waters of the United States, and that these

activities would be regulated under Section 404 of the CWA when they have or would have the

effect of destroying or degrading waters of the United States, including wetlands."  58 Fed. Reg.

at 45008.  Accordingly, the agencies amended the definition of "discharge of dredged material"

to include, among other things, "any addition, including any redeposit, of dredged material,

including excavated material, into waters of the United States which is incidental to any activity, including mechanized landclearing, ditching, channelization, or other excavation." 33 C.F.R. §323.2(d)(1)(iii) (1994); 40 C.F.R. §232.2 ("Discharge of dredged material" §(1)(iii)) (1994).

To mitigate any unfair prejudice to the regulated community that might result from this new definition, the agencies "developed procedures to 'grandfather' certain 'discharges of dredged material' that had not previously been regulated in some Corps districts. 58 Fed. Reg. at 45027.  Specifically, Section 404 authorization would not be required for "discharges of dredged material" that had not been previously regulated in certain locations, if the discharges had begun prior to the rule change and were completed within one year following final publication of the new rule.  *Id*.  Moreover, to "further ensure that implementation of the [new] definition proceeded in a fair and equitable manner," the Corps retained the authority to extend the 12-month grandfather provision "on a case-by-case" basis, provided that, among other things, the "discharger submits a completed individual permit application to the Corps within one year from the date of publication of this final rule."  Id.  This "grandfather" rule was codified into the agencies' regulatory definition.  *See* 33 C.F.R. §323.2(d)(3)(iii) (1994); 40 C.F.R. §232.2 ("Discharge of dredged material," §(3)(iii)) (1994).

As noted, the 1993 rule also codified the agencies' informal policy of excluding "prior converted croplands" from the scope of "waters of the United States" over which the agencies would retain CWA jurisdiction.  58 Fed. Reg. 45031-45032.  As explained in the agencies' final ruling, "prior converted cropland," as defined by the USDA's Soil Conservation Service, refers to "areas that, prior to December 23, 1985, were drained or otherwise manipulated for the purpose, or having the effect, of making production of a commodity crop possible."  *Id*. at 45031.  The rule change was meant to "help achieve consistency among various federal

programs affecting wetlands." *Id.* The exclusion of "prior converted cropland" from the definition of "waters of the United States" was thus codified into the EPA's and Corps' administrative regulations, albeit with the recognition that the EPA retained "final authority regarding Clean Water Act jurisdiction." *See* 33 C.F.R. §328.3(a)(8) (1994); 40 C.F.R. §232.2 (defining "Waters of the United States") (1994). Relevantly for present purposes, the agencies clarified that this rule change did *not* effectuate a "retroactive grandfathering of illegal drainage activities" that may have occurred prior to 1985. *Id*. at 45034. On the contrary, as the final ruling expressly advised:

> It has been and continues to be the position of the Corps and EPA that unauthorized discharge activity cannot eliminate Section 404 jurisdiction. Therefore, wetlands that were converted to prior converted cropland between 1972 and 1985 as a result of unauthorized discharges of dredged or fill material do not constitute "prior converted cropland" within the meaning of today's rule and remain "waters of the United States" subject to Section 404 regulation.

*Id*.

This brings us to the 2001 rule change that Defendants proffer as grounds for equitable relief. On January 17, 2001, the Corps and EPA enacted an administrative rule that further modified the agencies' definition of "discharge of dredged material" in order to "clarify what types of activities . . . are likely to result in regulable discharges." 66 Fed. Reg. 4550, 4552 (January 17, 2001). Based upon a court ruling that had found the prior definition too broad as it related to regulation of "incidental fallback" dredged material, *Nat'l Mining Ass'n v. U.S. Army Corps of Engineers*, 145 F.3d 1339 (D.C. Cir. 1998), the EPA and Corps in 2001 provided a specific definition of "incidental fallback" that expressly excluded such activity from the scope of regulable "discharge of dredged material." 66 Fed. Reg. 4551. As part of the same rule change, the agencies also included new language pertaining to the use of mechanized earth-moving equipment, *id*. at 4552-4553, and -- more relevant for present purposes -- eliminated (as

78

outdated) the "grandfather" provision that related to the 1993 changes in the definition of "discharge of dredged material."  *Id*. at 4553.

In support of their request for prospective equitable relief, Defendants appear to be arguing that they have been unfairly prejudiced by the elimination of the aforementioned grandfather clause.  They claim they "could not have anticipated the loss of the substantial untapped benefit said provision had made available" when they signed the Consent Decree in July 1996.  ECF No. 314 at 122.

This argument makes little sense. First, it is difficult to see how Brace could have benefitted from the 1993 grandfather clause relating to "discharges of dredged material" because: (a) it did not cover any "mechanized landclearing" that Brace may have engaged in, (b) Brace has not shown that he committed "discharges of dredged material" that were previously unregulated by the Corps in this particular district (which was a requirement for "grandfathering"), and (c) there is no evidence that Brace ever submitted a permit application within the year following the 1993 rule change (also a prerequisite for "grandfathering"). *See* 58 Fed. Reg. 45027; 33 C.F.R. §323.2(d)(3)(iii) (1994); 40 C.F.R. §232.2 (1994) (defining "Discharge of dredged material"). To the extent Brace portrays the 2001 rule change as somehow involving the elimination of a grandfather clause pertaining to the agencies' policy on "prior converted cropland," he is conflating two entirely separate regulatory actions.  And, to the extent Brace places any reliance on the 1993 regulatory amendments that excluded "prior converted croplands" from the definition of "waters of the United States," his argument fails for the simple reason that the 1993 regulatory provision *predated* the Consent Decree; therefore it cannot constitute a "change in the law" that now renders continued enforcement of the Consent Decree inequitable.  In any event, nothing about the 1993 rule change advances Brace's position

in this proceeding because, in excluding "prior converted croplands" from the definition of "waters of the United States," the agencies expressly disavowed any intention to give landowners protective "grandfathered" status for their prior unpermitted discharges.  *See* 58 Fed. Reg. 45034 ("[W]etlands that were converted to prior converted cropland between 1972 and 1985 as a result of unauthorized discharges of dredged or fill material do not constitute "prior converted cropland" . . . and remain "waters of the United States" subject to Section 404 regulation."). Further, any questions as to whether Brace's original discharges involved jurisdictional waters of the United States was settled in *Brace I*.  *See* 41 F.3d at 120 (observing that the district court had rendered unchallenged findings that the 30-acre wetlands site on the Murphy Farm constituted waters of the United States at the time of Defendants' activities, and that Defendants' involvement in clearing, mulching, churning, and levelling the area constituted a discharge of pollutants into the waters of the United States).

In sum, neither the agencies' 1993 rule nor their 2001 regulatory amendment impact the terms of the Consent Decree.  They do not legalize any activities that the Consent Decree injunction was intended to prohibit, nor do they make any of Brace's obligations under the Consent Decree impermissible. Consequently, no grounds for vacatur exist on this basis.

(vi)

The last purported "legal change" involves a joint regulation issued by the EPA and the Corps in 2015 which, Defendants claim, redefined "Waters of the United States" in a manner that significantly expanded federal jurisdiction over additional portions of Brace's interconnected farms.  ECF No. 314 at 122-134.  Once again, the Defendants' argument provides no persuasive basis for granting them prospective relief from the Consent Decree.

80

Here, Defendants are referring to an administrative regulation, adopted on June 29, 2015 and entitled "Clean Water Rule:  Definition of 'Waters of the United States.'"  80 Fed. Reg. 73054.  The "Clean Water Rule" did not purport to establish any regulatory requirements but was instead intended to be a "definitional rule that clarifies the scope of 'waters of the United States' consistent with the Clean Water Act (CWA), Supreme Court precedent, and science."  *Id*. at 37054.  To provide a "simpler, clearer, and more consistent approach[ ] for identifying the geographic scope of the CWA," *id*. at 37057, the agencies recognized eight categories of jurisdictional waters, organized into three basic categories:  waters that are jurisdictional in all instances, waters that are excluded from jurisdiction, and a narrow category of waters subject to case-specific analysis to determine whether they are jurisdictional.  *Id*.  This approach "replace[d] existing procedures that often depend on individual, time-consuming, and inconsistent analyses of the relationship between a particular stream, wetland, lake, or other water with downstream waters."  *Id*.  As explained in the final rule:

> The first three types of jurisdictional waters, traditional navigable waters, interstate waters, and the territorial seas, are jurisdictional by rule in all cases. The fourth type of water, impoundments of jurisdictional waters, is also jurisdictional by rule in all cases. The next two types of waters, "tributaries" and "adjacent" waters, are jurisdictional by rule, as defined, because the science confirms that they have a significant nexus to traditional navigable waters, interstate waters, or territorial seas. For waters that are jurisdictional by rule, no additional analysis is required. The final two types of jurisdictional waters are those waters found after a case-specific analysis to have a significant nexus to traditional navigable waters, interstate waters, or the territorial seas, either alone or in combination with similarly situated waters in the region. . . . [F]or these waters the agencies will continue to assess significant nexus on a case-specific basis.

*Id*. at 37058.

In their brief, Defendants expound at length on the Clean Water Rule, but their central premise is that this 2015 rule change placed significant burdens on Brace's farm. They object to the fact that, under the 2015 rule, wetlands were determined to be "jurisdictional by rule"

without any need for case-specific analysis.  ECF No. 314 at 122.  They contend that the rule

broadened the definition of the term "tributary," and they also object that "all adjacent" waters

and tributaries are deemed to be "jurisdictional by rule."  *Id*. at 123.  They object that, under the

Clean Water Rule, application of the "significant nexus" standard "is not a purely scientific

determination" but a discretionary one.  *Id*. at 126.  They conclude that, since the effective date

of the Clean Water Rule (August 25, 2015), "EPA and the Corps have been able to claim federal

jurisdiction over practically the entire Marsh farm tract . . . and over the western portion of the

Homestead farm tract, even though both qualify for the normal farming exemption from CWA

§404 permitting." *Id*.

      This line of argument provides no valid basis for vacating the 1996 Consent Decree.

First, as Defendants well recognize, the Clean Water Rule was repealed by EPA and the Corp,

effective December 23, 2019.  *See* 84 FR 56626-01 (Definition of "Waters of the United

States"—Recodification of Pre-Existing Rules) (Oct. 22, 2019) (indicating that the agencies were

restoring the regulatory text that existed prior to the 2015 rule).  Consequently, any legal changes

that the 2015 rule change previously wrought are now moot and can have no relevance at this

point in terms of the Court's future enforcement of the Consent Decree.[6]  Second, even if the

2015 Clean Water Rule had not been repealed, Defendants do not contend that the provisions of

the rule legalized activities that the Consent Decree injunction was intended to prohibit, or that it

somehow rendered the Defendants' Consent Decree obligations impermissible.  While

Defendants speculate that the Government's expert (Dr. Robert Brooks) "arguably" made his

---

[6] The Court notes that, in April 2020, the agencies promulgated the "Navigable Waters Protection Rule" ("NWPR"), which provided a new regulatory definition for "waters of the United States." *See* 85 Fed. Reg. 22,250 (The Navigable Waters Protection Rule: Definition of "Waters of the United States") (April 21, 2020).  Defendants do not address this new rule or how it might or might not affect the terms of the Consent Decree.

wetlands determination on the Marsh Site using the 2015 Clean Water Rule standards, that theory has no bearing on the provisions of the Consent Decree in this case and whether prospective enforcement of its terms remain equitable.

(vii)

In sum, notwithstanding the Defendants' protracted discussion of the foregoing purported legal "changes," they fail to persuasively explain how these measures directly impact their responsibilities under the Consent Decree. Indeed certain provisions – such as the 1993 rule pertaining to prior converted croplands and the Pennsylvania Constitution's public trust provision – actually predate the Consent Decree and involve no "change" in the law at all. Those purported changes that do postdate entry of the Consent Decree have no real bearing on the Defendants' obligations under the Consent Decree and are therefore irrelevant. Two provisions upon which Defendants rely – the 2010 Executive Order and the 2015 Clean Water Rule – have since been rescinded and have no substantial relevance at this point. And those legal "changes" that have resulted in stricter environmental standards are of no legal moment because they are entirely consistent with the goals of the Consent Decree – namely the protection of acquatic resources and related ecosystems. Finally, Brace's suggestion that he has somehow been unfairly burdened by the EPA's actions relative to the Marsh Farm are irrelevant to the present civil action. At bottom, Brace has not pointed to any change in the law that now authorizes the activities the Consent Decree was designed to prohibit. Nor has Brace shown that any affirmative obligations placed upon him by the Consent Decree have become impermissible by virtue of a change in the law.

### 3.   ALLEGED AMBIGUITIES IN THE CONSENT DECREE REMEDIATION PLAN

Though not proffered specifically as a basis for equitable relief, Defendants devote a considerable portion of their brief to the proposition that the terms of the Consent Decree are ambiguous.  To the extent this line of argument is relevant to the Court's Rule 60(b) analysis, it is unpersuasive.

As to this point, the Court will not expound extensively on the Defendants' arguments; rather, it will simply make two relevant observations.  First, the record suggests that, notwithstanding the allegedly ambiguous nature of the Consent Decree, Defendants initially complied with its remedial measures, evidently without any significant difficulty understanding what was required of them.  Second, despite now pointing to certain ambiguities (which, based on Defendants' arguments should have been evident from the face of the document), Defendants never sought clarification of their obligations for approximately ten years.  *See Brace II*, 72 Fed. Cl. at 363 (finding that, as of January 14, 2005, Defendants had "never contacted the EPA, the Corps, any other Federal agency, or even the district court that entered the Consent Decree" to raise any concerns regarding the terms of the Consent Decree).  At this juncture, the Court finds no grounds for relief under Rule 60(b)(5) based upon alleged ambiguities in the Consent Decree.

### 4.   FACTORS UNIQUE TO THE CONDITIONS OF THE CASE

As discussed at the outset, a court that is reviewing a motion to vacate or modify a consent decree should "respond to the specific set of circumstances before it by considering factors unique to the conditions of the case." *Democratic Nat'l Comm.*, 673 F.3d at 202.  These factors include:  the circumstances leading to entry of the injunction and the nature of the conduct sought to be prevented; the length of time since entry of the injunction; whether the party subject to its terms has complied or attempted to comply in good faith with the injunction;

84

and the likelihood that the conduct or conditions sought to be prevented will recur absent the injunction. *Id.* "In weighing these factors, the court must balance the hardship to the party subject to the injunction against the benefits to be obtained from maintaining the injunction' and the court should also 'determine whether the objective of the decree has been achieved." *Id*.

In this case, consideration of the foregoing factors weighs against the relief that Defendants are seeking. The Consent Decree injunction was entered only after the U.S. Court of Appeals for the Third Circuit found, as a matter of law, that Brace had violated the Clean Water Act by discharging unpermitted dredged or fill materials into jurisdictional Waters of the United States within the present-day Consent Decree Area. Rather than face stiffer penalties under the Clean Water Act, Brace entered into the Consent Decree, paid stipulated penalties, agreed to certain remedial measures, and was enjoined from engaging in further unpermitted discharges. Brace initially implemented the required remedial measures, but he unwound them approximately six years later in 2012. Not until 2018 – after the Government sought to hold Brace accountable and enforce the Consent Decree penalties -- did Brace actually seek relief from the Consent Decree. Although Brace has maintained that he attempted to work with the Government in good faith toward a resolution of the water accumulation problems on his farm, his conduct as it relates to the Consent Decree Area has been reckless at best and, at worst, brazen. His involvement in draining, clearing, plowing, and farming the jurisdictional wetlands have frustrated the objectives of the Consent Decree. Accordingly, the Government has valid concerns that the wetlands within the Consent Decree Area will again be degraded if the terms of the Consent Decree are modified or vacated. On balance, the Court finds that any hardship the Consent Decree has created for Brace is outweighed by the environmental benefits that would result from its continuation. Given the absence of any material change in factual or legal

circumstances that renders continued enforcement of the Decree inequitable or unworkable, no valid basis exists for granting the Defendants the relief they are seeking.

## V.  CONCLUSION

Based upon the foregoing discussion, the Government's motion to enforce the Consent Decree will be granted in part and denied in part, without prejudice, as set forth herein.  The Defendants' motion for relief under Rule 60(b)(5) will be denied with prejudice.  The Court will also deny Defendants' request to hold the Government in contempt.

An appropriate Order follows.

Susan Paradise Baxter
United States District Judge